CITY OF NEW BEDFORD & others *vs.* NEW BEDFORD, WOODS HOLE, MARTHA'S VINEYARD AND NANTUCKET STEAMSHIP AUTHORITY & others.

Bristol.    April 9, 1953. — September 14, 1953.

Present: QUA, C.J., LUMMUS, WILKINS, WILLIAMS, & COUNIHAN, JJ.

*New Bedford, Woods Hole, Martha's Vineyard and Nantucket Steamship Authority. Administrative Matter. Moot Question. Statute, Construction. Equity Pleading and Practice, Parties, Declaratory proceeding. Carrier, Common carrier.*

The question whether the New Bedford, Woods Hole, Martha's Vineyard and Nantucket Steamship Authority has power under St. 1948, c. 544, to suspend steamship service to and from the port of New Bedford during the slack season, although held to have become moot in a certain proceeding because the season there involved had expired without actual suspension of service, was not moot in a subsequent proceeding in view of the continuing design of the authority so to suspend service. [424]

Municipal corporations subject to assessment under § 9 of St. 1948, c. 544, to make up any deficit in the operation by the New Bedford, Woods Hole, Martha's Vineyard and Nantucket Steamship Authority of its

330 Mass. 422                                                    423

New Bedford *v.* New Bedford, Woods Hole &c. Steamship Authority.

steamship line were interested and proper parties to a suit in equity brought to secure a declaratory decree as to the obligation of the authority under the statute to furnish steamship service to and from the port of New Bedford. [424]

An adequate basis for a declaratory decree as to the obligation of the New Bedford, Woods Hole, Martha's Vineyard and Nantucket Steamship Authority under St. 1948, c. 544, to furnish steamship service to and from the port of New Bedford was found in the statute itself when read in the light of its own history and of certain incontrovertible geographical facts and other facts of common knowledge or of which judicial notice was taken. [426]

A report of a special commission to the Legislature, to which was appended a report of an engineering concern employed by the commission, might properly be considered in construing a statute based thereon. [429]

The New Bedford, Woods Hole, Martha's Vineyard and Nantucket Steamship Authority cannot lawfully abandon steamship service to and from any of the ports named in St. 1948, c. 544. [430]

The steamship service to be furnished by the New Bedford, Woods Hole, Martha's Vineyard and Nantucket Steamship Authority to and from any of the ports named in St. 1948, c. 544, is an administrative matter to be determined by the authority without interference by the courts unless the authority violates the statute by abandoning a port or by acting capriciously, whimsically or arbitrarily and without cause. [431]

The furnishing of continuous steamship service to and from the port of New Bedford at all seasons of the year by the New Bedford, Woods Hole, Martha's Vineyard and Nantucket Steamship Authority is not required as a matter of law by St. 1948, c. 544. [432]

The New Bedford, Woods Hole, Martha's Vineyard and Nantucket Steamship Authority for cause may suspend steamship service to and from the port of New Bedford during the slack season, even from the latter part of September until the latter part of April; and the authority's determination of cause will not be disturbed by the courts unless shown to be capricious, whimsical or arbitrary. [432–433]

BILL IN EQUITY, filed in the Superior Court on September 3, 1952.

The suit was heard by *O'Connell*, J.

*Robert G. Dodge*, (*Harold S. Davis* with him,) for the defendant New Bedford, Woods Hole, Martha's Vineyard and Nantucket Steamship Authority.

*Harry A. Lider*, City Solicitor, for the plaintiff city of New Bedford.

*Kenneth B. Williams*, for Standard Grocery Company and others, interveners.

*W. Arthur Garrity, Jr.,* for individuals from Woods Hole, interveners.

*George M. Poland,* for Lewis and others, interveners.

*James C. Roy,* for County of Dukes County, intervener.

*Russell J. Coffin,* for town of Nantucket, intervener.

Qua, C.J. This case involves the interpretation of St. 1948, c. 544,[1] which created the New Bedford, Woods Hole, Martha's Vineyard and Nantucket Steamship Authority. The controlling issue relates to the legal duty of the authority under the act to furnish steamship service to New Bedford and particularly raises the question whether it can suspend such service from the latter part of September until the latter part of April as it attempted to do until it was enjoined in the season of 1952–1953, and as it proposes to do, if it has the power, in the season of 1953–1954.

A similar question was held to have become moot in *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket Steamship Authority,* 329 Mass. 243, but the continuing design of the authority to suspend the service now leaves the question alive and no longer moot. *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498, 514–516. See *Kenworthy & Taylor, Inc.* v. *State Examiners of Electricians,* 320 Mass. 451, 453; *School Committee of Cambridge* v. *Superintendent of Schools of Cambridge,* 320 Mass. 516. Compare *Clinton Housing Authority* v. *Finance Committee of Clinton,* 329 Mass. 495, 498–499.

The present proceeding takes the form of a bill for a declaratory decree brought by the city of New Bedford against the authority. The County of Dukes County and the town of Nantucket have been allowed to intervene as parties defendant. It seems to us that all of these municipal corporations are interested and proper parties to a suit to secure a declaratory decree as to the power and duty of the authority, because of the assessments to which they may become subject, as hereinafter appears.

A group of individuals alleging that they are residents

---

[1] An amendment by St. 1949, c. 142, does not appear to affect this case.

and taxpayers of Nantucket have been allowed to intervene as parties defendant. Another group alleging that they are taxpayers or voters or taxpayers and voters in Falmouth, and a third group of individuals and private corporations alleging that they are shippers of merchandise from New Bedford have been allowed to intervene as parties plaintiff. There may be serious doubt as to the rights of any of these individuals and private corporations to be admitted to the suit. *Chandler* v. *Railroad Commissioners,* 141 Mass. 208. But it does not appear that any objection has been made to their presence until now, and in the view we take of the case we cannot see that the result will be in any way affected whether they are called parties or not. Compare *Bolster* v. *Attorney General,* 306 Mass. 387, 390–391. It does not seem to us that the point need be discussed.

The case comes here with scarcely any facts and upon a report by the trial judge in which he says that "At the hearing . . . the parties contended that the case could be disposed of without determination of any of the issues of fact raised by the pleadings, the petitioners arguing that the statutes establishing the Steamship Authority . . . require the continuance of steamer service to and from New Bedford at all times and the respondents contending that the statutes vest full control of the matter in the Authority and that it may accordingly suspend service at New Bedford" as proposed. The judge ruled that "regardless of the issues of fact presented by the pleadings, the statutes establishing the Authority require continued service at New Bedford at all seasons of the year" and ordered a decree permanently enjoining the authority from suspending service there "for any period of time."

The authority now suggests that the case is really here on bill and answers and that the facts properly averred in its answer must now be taken as true. *Joslin* v. *Boston & Maine Railroad,* 274 Mass. 551. *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket Steamship Authority,* 329 Mass. 243, 244. We are not prepared to follow this suggestion, since in truth the judge did make

a finding of fact that the authority proposed to suspend the
service in the season of 1953–1954, and his report seems to
indicate that instead of hearing the case upon the facts set
up in the bill and answers he made his determinative ruling
"regardless" of those facts.  Moreover, the facts set up in
the answers of the several parties defendant, even those
which are municipal corporations, are not the same.

But notwithstanding the absence of facts specially estab-
lished for the purposes of this report, we are of opinion that
an adequate basis can be found for a declaratory decree in
the statute of 1948 itself when read in the light of its own
history, and of certain incontrovertible geographical facts
and other facts of common information or of which we can
properly take judicial notice.

To begin with the statute itself: The title of the act is
"An Act providing for the acquisition, maintenance and
operation of the steamship line operating between New
Bedford, Falmouth and the islands of Nantucket and
Martha's Vineyard, providing for the creation of the New
Bedford, Woods Hole, Martha's Vineyard and Nantucket
Steamship Authority and defining its powers and duties
and providing for the financing of said project."  This is
followed by an "Emergency preamble" which states the
purpose of the act to be "to provide without delay adequate
transportation facilities between New Bedford, Falmouth
and the islands of Martha's Vineyard and Nantucket."
Section 1 of the act says that "In order to provide adequate
transportation of persons and necessaries of life for the
islands of Nantucket and Martha's Vineyard, the Authority
hereinafter created is hereby authorized and empowered
to purchase, construct, maintain and operate necessary
vessels, docks, wharves . . ." and so forth.  It may be
noted in passing that this section, which is the main operative
section of the statute, places the emphasis upon the "trans-
portation of persons and necessaries of life for the islands"
and does not mention any mainland port.  However, it is
not inconsistent with either the title or the preamble (*S.S.
White Dental Manuf. Co.* v. *Commonwealth,* 212 Mass. 35;

*Judson Freight Forwarding Co.* v. *Commonwealth*, 242 Mass. 47, 51), since any service "for the islands" must have one or more termini on the mainland. Section 3 creates the authority as a body corporate and a public instrumentality and provides that it shall consist of five members to be appointed by the Governor by and with the advice and consent of the Council. One member is to be a resident of Nantucket, one of Martha's Vineyard, one of New Bedford, and one of Falmouth. The fifth member, whose residence is not prescribed, is to be chairman. Section 4 contains in clause (b) a definition of the words "steamship line" as meaning "the existing vessels, real and personal estate" and as embracing all property rights, easements and interests acquired by the authority for the operation of the steamship line. The same section in clause (c) provides that the cost of the project "shall embrace the cost of the acquisition of the steamship line operated by the Massachusetts Steamship Lines, Incorporated, and shall include all of the land, property rights, easements and interests acquired by the Authority . . .." Section 5 in clause (a) empowers the authority "To acquire, maintain, repair and operate the project." Clause (h) authorizes the authority to employ "regular employees of the Massachusetts Steamship Lines, Incorporated," and to recognize their existing seniority and pension rights. The remaining provisions of the act deal largely with the financing of the project and are not of concern here, except that in § 9 is a provision to the effect that the city of New Bedford, the town of Falmouth, the town of Nantucket, and the County of Dukes County [1] may be called upon to make up any operating deficit in the respective proportions of fifteen per cent, ten per cent, twenty-five per cent, and fifty per cent, and § 13 provides that the authority is authorized to purchase or otherwise acquire either the property or the stock of the Massachusetts Steamship Lines, Incorporated, "which now operates the steamship line between New Bedford,

---

[1] This county is to allocate the burden among its several towns, except Gosnold, which is not in a location to benefit from the project.

Falmouth, Martha's Vineyard and Nantucket," and that if it takes the property it must assume the indebtedness of that line.

The islands of Martha's Vineyard and Nantucket both lie in the Atlantic Ocean south of Cape Cod. Each, including adjacent islands, is roughly about twenty miles in extreme length. Martha's Vineyard, the nearer and larger of the two, is about ten miles wide at its widest point. Nantucket, excluding a long narrow sand spit, is of about half that width. From Vineyard Haven or Oak Bluffs on Martha's Vineyard to the nearest mainland port at Woods Hole is only some five or six miles. To reach New Bedford it is necessary to cross Buzzard's Bay, and this adds about sixteen miles. From Nantucket to Woods Hole is about thirty-five miles and to New Bedford about fifty-one miles. A round trip from New Bedford through to Nantucket and return would apparently somewhat exceed one hundred miles. A round trip from Woods Hole and return would scarcely exceed seventy miles. The combined permanent population of the six towns on Martha's Vineyard, all in the County of Dukes County, according to the census of 1950 was 5,577. The permanent population of Nantucket was 3,484. Neither island is industrialized. Neither can boast of any considerable amount of general agriculture or of natural resources. Neither produces enough to supply to its inhabitants more than a small fraction of the necessities of civilized living. But both islands enjoy a summer climate which, together with ample means of recreation on land and sea, has attracted a great many people as summer visitors, so that the entertainment of vacationists has become a large industry. A report which the Legislature had before it when the act of 1948 was passed, and to which further reference will be made presently, estimates that the total summer population reaches a peak of 50,000. Woods Hole is in the town of Falmouth, which is on the mainland. In 1950 Falmouth had a permanent population of 8,662. It is also a resort town. It has full railroad and modern highway communications with all other mainland points,

including New Bedford, although it is much farther in miles to go around Buzzard's Bay by land than it is to cross it by boat. New Bedford, on the mainland, is not a summer resort. It is a manufacturing and commercial city of about 109,000 people with varied interests.

The act of 1948 was based upon a report and recommendations of a special commission set up by c. 60 of the Resolves of 1947 (revived and continued by c. 5 of the Resolves of 1948) to investigate the subject of water transportation "between New Bedford, Woods Hole, Martha's Vineyard and Nantucket." We may consider this report for any light it may shed upon the construction of the act of 1948. *Hood Rubber Co.* v. *Commissioner of Corporations & Taxation*, 268 Mass. 355, 357–358. To the commission's report is appended a report by an engineering concern employed by the commission. In the last mentioned report it is stated that in spite of air transportation the people of the islands "rely upon water transportation for all food and other supplies, mail and personal contact with the mainland of Massachusetts . . ."; that the peak period of four summer months "generates approximately 85 per cent of the total annual passenger and automobile traffic"; that during the remainder of the year "a very low traffic volume is experienced"; that the "largest volume of passenger traffic is between Woods Hole and Martha's Vineyard during the summer peak periods"; that the "major freight volumes are carried from New Bedford to Oak Bluffs [Martha's Vineyard] and Nantucket"; that "a fairly constant tonnage of freight of appreciable magnitude is carried between these points throughout the year"; that New Bedford was the "principal mainland terminal" of the then existing steamboat service; and that wharves and a small office building were located there. We recite the foregoing statements not as facts established in this case but as information which the Legislature had before it when it passed the act of 1948. It is further apparent from the engineers' report to the commission, the commission's report to the Legislature, and the act itself that it was expected that the

authority would acquire and continue to operate the existing line, including service to all of the ports previously served.

It is apparent, however, from facts of common knowledge and may be taken as established, that the volume of business handled by the authority, as to both passengers and freight, is and will remain highly seasonal in character, varying from the needs of a small permanent population on the islands in the winter to the needs of a summer population many times larger. It is further apparent that steamboat service is vital to the economic survival of the islands at all seasons, but is not a matter of life or death to either Falmouth or New Bedford at any season. This difference is reflected in the fact that the Legislature placed seventy-five per cent of any operating deficit upon the small island communities and only ten per cent upon the comparatively large town of Falmouth and only fifteen per cent upon the large city of New Bedford.

It is of course the legal duty of the authority to carry out the task assigned to it by the Legislature. We think that task includes necessary service to all ports named in the act and that, unless the act is amended, the authority cannot lawfully abandon any of them. It is true that § 1 of the act mentions only adequate transportation for the islands, but to supply that the authority is authorized "to purchase, construct, maintain and operate" the necessary "vessels, docks, wharves." These must include wharves upon the mainland. We think that the history of the statute as well as the express terms of the preamble show that mainland wharves were intended to be maintained at Falmouth and New Bedford. This is not a case where the preamble must be disregarded because inconsistent with the terms of the act itself. Compare *Milk Control Board* v. *Gosselin's Dairy, Inc.* 301 Mass. 174, 179–180; *Charles I. Hosmer, Inc.* v. *Commonwealth,* 302 Mass. 495, 501. Referring particularly to New Bedford, the port about which the present controversy centers, the factors which lead us to the conclusion that this port must be continued may be

enumerated as these: the fact that the authority was designed to take over an existing line which operated to New Bedford and necessarily had terminal facilities there which were to be taken over, together with the employees of the existing line, the inclusion of New Bedford in the title of the act, in the statement of its purpose contained in the preamble, and in the title of the authority itself, the requirement that one member of the authority should reside in New Bedford, and especially the provision for the assessment of fifteen per cent of any operating deficiency upon New Bedford — a provision which it would be hard to justify if the line to that city could be discontinued.

On the other hand, the words and the tenor of the act make it plain that management of the project is to be vested in the authority. This includes, as it must in the case of any transportation enterprise, power to adapt the service furnished to the amount of traffic offered. It includes proper consideration of costs, operating problems, including the necessity of laying up vessels for repairs, and other relevant factors, prominent among which are of course the two great peculiarities of this case, the unusual necessities of the islands and the seasonal character of the business. There is no requirement in the act of daily service or of any specified amount of service to any of the ports. All these are administrative matters to be determined by the authority and not by the courts. So long as the authority exercises its judgment in the administrative field the courts cannot interfere. The courts can interfere only if the authority wholly or practically abandons one of the ports or capriciously, whimsically, or arbitrarily and without cause, and therefore in violation of the statute, refuses to provide to one of them a minimum of service which in view of existing conditions can be called "adequate." *MacDonald* v. *Street Commissioners of Boston*, 268 Mass. 288, 294. *Archambault* v. *Mayor of Lowell*, 278 Mass. 327, 333–335. *General Outdoor Advertising Co. Inc.* v. *Department of Public Works*, 289 Mass. 149, 192. *Stockus* v. *Boston Housing Authority*, 304 Mass. 507, 509–510. *Lamarre*

v. *Commissioner of Public Works of Fall River*, 324 Mass. 542, 545. *Kidder* v. *City Council of Brockton*, 329 Mass. 288. *Butler* v. *East Bridgewater, ante*, 33, 38–39.

Would the suspension of service to New Bedford during the winter months necessarily constitute such a violation of the statute? We cannot rule that it would. It would not be an abandonment. It would not necessarily be capricious, whimsical, or arbitrary. There may be persuasive reasons for it, within the scope of administrative discretion. The facts are not before us. For all we know winter business at New Bedford, which from the nature of the case must always have been small in comparison with summer business, may have declined still further. It may be conducted at a heavy loss and may throw a great burden of expense upon the islands without corresponding benefit to them and without great advantage to New Bedford. The extra thirty-two mile round trip across Buzzard's Bay may cast a burden upon the vessels which may interfere with winter repairs or may reduce necessary service to the islands. If the judgments of reasonable men might differ, the question is one for the authority and not for us.

It has been suggested in the briefs that failure to serve New Bedford in the winter season may impair the certificate of convenience and necessity which the authority holds from the interstate commerce commission. This does not seem to us likely (see *United States* v. *Seatrain Lines, Inc.* 329 U. S. 424); but in any event, if it should happen, it would present a different situation from that now before us. The decree now to be entered declaring duties under the State law ought not to be based upon speculation of this sort.

It will be seen from what has been said that in our opinion the trial judge went too far in ruling that as matter of law the authority must maintain continuous service at New Bedford at all seasons of the year. We think it is within the power of the authority in its discretion for cause to suspend service to New Bedford during the seasonal period of reduced traffic. Whether it could similarly suspend service to one of the islands or between the islands and Woods Hole

is another matter because of the vital necessity of maintaining some service at all seasons between the islands and the mainland. We do not consider these questions.

The order of the judge is reversed, and a final decree is to be entered declaring that the authority cannot lawfully abandon any of the ports mentioned in the act, but that it can for cause suspend service at New Bedford in the slack season, even for as long a period as from the latter part of September until the latter part of April; that what constitutes cause is to be determined by the authority and not by the courts, so long as the authority refrains from capricious, whimsical or arbitrary action; and that action taken will be presumed valid until the contrary is shown.

*So ordered.*