380 Mass. 785 785

Woods Hole, Martha's Vineyard & Nantucket S.S. Auth. *v.* Martha's Vineyard Comm'n.

WOODS HOLE, MARTHA'S VINEYARD & NANTUCKET
STEAMSHIP AUTHORITY *vs.* MARTHA'S VINEYARD COMMISSION.

Barnstable. February 5, 1980. — June 4, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Woods Hole, Martha's Vineyard and Nantucket Steamship Authority.*
*Martha's Vineyard Commission. Jurisdiction,* Declaratory relief.
*Administrative Agency. Regulation. Words,* "Agency."

An action by the Woods Hole, Martha's Vineyard and Nantucket Steam-
ship Authority seeking a declaration that it was not subject to the
regulatory powers of the Martha's Vineyard Commission with regard
to the Authority's proposed construction of a ferry slip and repairs to
an existing slip on Martha's Vineyard presented an actual controversy
in which both parties' interests were sufficient to warrant declaratory
relief. [792-793]
The Woods Hole, Martha's Vineyard and Nantucket Steamship Authority
is not an agency exempt from regulation by the Martha's Vineyard
Commission under St. 1977, c. 831, § 2. [795-801]
Discussion of the scope of the regulatory power of the Martha's Vineyard
Commission over the Woods Hole, Martha's Vineyard and Nantucket
Steampship Authority. [801-804]
The standards, criteria and regulations authorized by St. 1977, c. 831,
§§ 7, 12, need not be filed with the Secretary of the Commonwealth
pursuant to G. L. c. 30A in order for them to become effective. [804]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 2, 1979.

The case was reported to the Appeals Court by *Keat-*
*ing,* J. The Supreme Judicial Court, on its own initiative,
ordered direct review.

*Laurence S. Fordham (Terry S. Kogan* with him) for the
plaintiff.

*Donald L. Connors (Laura J. Goldin* with him) for the
defendant.

QUIRICO, J.   This case was reserved and reported without decision by a judge of the Superior Court.   The plaintiff (Authority) brought an action there "for declaratory and injunctive relief . . . pursuant to Section 18 of Chapter 831 of the Acts of 1977, M.G.L. c. 23[1]A, § 1, and M.G.L. c. 30A, § 14," to the effect that the Authority is not subject to the regulatory powers of the defendant (Commission) with regard to the Authority's proposed construction of a second ferry slip and repairs to an existing slip in the Vineyard Haven Harbor of Martha's Vineyard.   The Authority also asked the Superior Court judge to "annul the decision of the Commission dated June 7, 1979 pursuant to [St. 1977, c. 831, § 18]."   We hold that the Authority is, within certain limits, subject to regulation by the Commission.   Because there was no evidence heard in the Superior Court concerning the validity of the Commission's decision pursuant to St. 1977, c. 831, § 18, we remand the case for further proceedings on that question.

1. *The Authority.*   The Authority was created by St. 1960, c. 701,[1] as a "body corporate . . . which shall be deemed to be a public instrumentality for the purposes of this act." *Id.* § 3.   Its purpose is "to provide adequate transportation of persons and necessaries of life for the islands of Nantucket and Martha's Vineyard," and to that end it is empowered to "purchase, construct, maintain and operate necessary vessels, docks, wharves, other vessels, equipment, furniture and supplies." *Id.* § 1.   It consists of three members:   one resident from the town of Nantucket appointed by the selectmen thereof, one from the county of Dukes County appointed by the county commissioners, and one resident from the town of Falmouth appointed by the selectmen. *Id.* § 3.   See St. 1963, c. 494.

The Legislature has enumerated specific powers of the Authority in St. 1960, c. 701, § 4, as amended through St. 1965, c. 437.   These include the power to "acquire, main-

---

[1] The Authority's predecessor was created by St. 1948, c. 544, which is discussed later in this opinion.

tain, repair and operate a boat line," to issue bonds, fix rates (subject to a limited power of regulation by the Department of Public Utilities), to "adopt by-laws for the regulation of its affairs and the conduct of its business," to make contracts, to employ and insure persons, to seek and accept Federal grants, and "to acquire, hold and dispose of real and personal property, including additional vessels and fixtures, for its corporate purposes." The Authority is exempt from State taxation. *Id.* § 6. Should the operating expenses of the Authority exceed the combination of its income and the statutory reserve fund, the Commonwealth is directed to pay the deficit and is authorized to recoup those funds from certain municipal and county governments, in certain stated proportions. *Id.* § 9.

The Authority's enabling legislation further provides that the act, "being necessary for the welfare of the commonwealth and its inhabitants, shall be liberally construed to effect the purposes thereof," and that "[a]ll other general or special laws, or parts thereof, inconsistent herewith are hereby declared to be inapplicable to the provisions of this act." *Id.* §§ 17, 19.

The Authority's enabling act has been amended several times since 1960. Most of the amendments have involved details such as financing and membership in the Authority and in its financial advisory board.[2] Others have mandated certain service routes or allowed other routes in the discretion of the Authority.[3] Other amendments dealt with various functions of the Authority not relevant here.[4] Two 1979 amendments required the Authority to hold annual public hearings in towns serviced in order to determine schedules, and to publish notice of the hearings. St. 1979, cc. 102, 140.

---

[2] See St. 1962, c. 675; St. 1963, c. 494, c. 528; St. 1964, c. 313, c. 563, §§ 2, 17; St. 1965, c. 779; St. 1968, c. 317; St. 1969, c. 779; St. 1978, c. 502, c. 524; St. 1979, c. 316.

[3] See St. 1965, c. 413; St. 1974, c. 392; St. 1979, c. 133.

[4] See St. 1962, c. 276, c. 760; St. 1964, c. 278; St. 1973, c. 942; St. 1976, c. 517; St. 1978, c. 427.

The Authority is no stranger to this and other courts of the Commonwealth. On several occasions we have been asked to decide questions involving the scope of its administrative powers and related matters.[5]

2. *The Commission.* The Legislature created the Martha's Vineyard Commission by St. 1974, c. 637. The enabling act was superseded by St. 1977, c. 831. A further amendment in 1979 changed the process of making Commission regulations to include participation by a greater number of town bodies. St. 1979, c. 319.

The Commission was created in response to studies which predicted that, unless action was taken, the unique natural, cultural, and historical beauty of the Nantucket Sound islands would be lost in the quest for private development, particularly for the second-home market. Gifford, An Islands Trust, 11 Harv. J. on Legis. 417, 418, 425-428 (1974). In 1972, a bill was introduced in the United States Senate which would have created a Federal trust in the

[5] See *Douglas* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 366 Mass. 459 (1974) (whether vessel is "equipment" for purposes of competitive bidding requirement); *Ballantine* v. *Falmouth,* 363 Mass. 760 (1973) (whether town can lease to Authority land taken by eminent domain); *National Shawmut Bank* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 361 Mass. 219 (1972) (disposition of funds); *Nantucket Express Lines, Inc.* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 350 Mass. 173 (res judicata), cert. denied, 384 U.S. 952 (1966); *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.* v. *Baxter,* 349 Mass. 288 (1965) (tonnage of competing ship); *Nantucket Boat Inc.* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 345 Mass. 551 (1963) (standing); *Barnstable* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 343 Mass. 674 (1962) (whether Authority may provide transportation to and from Barnstable); *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 336 Mass. 651 (contractual and constitutional issues), *S. C.,* 358 U.S. 53 (1958); *County of Dukes County* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 333 Mass. 405 (1956) (whether Authority has duty to suspend winter service to New Bedford); *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 330 Mass. 422 (1953) (whether Authority may suspend winter service to New Bedford); *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 329 Mass. 243 (1952) (whether Department of Public Utilities may order Authority to continue service to New Bedford).

380 Mass. 785 789

Woods Hole, Martha's Vineyard & Nantucket S.S. Auth. v. Martha's Vineyard Comm'n.

islands, and have granted extensive powers to the Secretary of the Interior, but local reaction to the bill was negative because of a fear of Federal control. See *id.* at 418-433; 119 Cong. Rec. 17576-17578 (1973).[6]

The provisions of the 1974 Commission statute were detailed in *Island Properties, Inc.* v. *Martha's Vineyard Comm'n.* 372 Mass. 216, 218-222 (1977). Rather than itemize the relatively minor changes which were made in the 1974 statute by the 1977 statute, we shall describe the 1977 statutory scheme.

The purpose of the Commission is to "protect the health, safety, and general welfare of island residents and visitors by preserving and conserving for the enjoyment of present and future generations the unique natural, historical, ecological, scientific, and cultural values of Martha's Vineyard which contribute to public enjoyment, inspiration and scientific study, by protecting these values from development and uses which would impair them, and by promoting the enhancement of sound local economies." St. 1977, c. 831, § 1. The statute was enacted in response to legislative declarations of facts concerning threats to the island's unique value.[7]

---

[6] This bill, S. 3485, 92d Cong., 2d sess. (1972), was replaced by two bills in 1973. S. 1929, 93d Cong., 1st sess., 119 Cong. Rec. 17576-17586 (1973), and H.R. 8318, 93d Cong., 1st sess., 119 Cong. Rec. 17537 (1973). These bills were referred to committee, and apparently never brought to a vote after the passage of the State statute creating the Martha's Vineyard Commission.

[7] Those legislative declarations of facts are essentially the same in the 1974 and 1977 acts. As expressed in the latter, they are: "The island of Martha's Vineyard possesses unique natural, historical, ecological, scientific, cultural, and other values and there is a regional and statewide interest in preserving and enhancing these values.

"These values are being threatened and may be irreversibly damaged by uncoordinated or inappropriate uses of the land.

"The protection of health, safety, and general welfare of island residents and visitors requires the establishment of a regional commission whose purpose shall be to ensure that henceforth the land usages which will be permitted are those which will not be unduly detrimental to those values or to the economy of the island.

"The preserving and enhancing of these values requires [*sic*] the designation of districts of critical planning concern and the recognition of

The Commission is composed of twenty-one members, nine of whom are elected from the towns on the island, and the remainder of whom are appointed by town boards of selectmen, the county commissioners, and the Governor. Four of the five members whom the Governor appoints are "persons whose principal residence is not on Martha's Vineyard," and these four have "voice but not vote."[8] All members serve for terms of two years. *Id.* § 2.

The principal substantive areas of authority of the Commission are the designation of areas of critical planning concern (CPC areas) and of developments of regional impact (DRI's), and the regulation of development in these designated areas or projects. *Id.* §§ 8-12. Because the Commission designated the proposed construction in the present case a DRI, we shall describe the statutory provisions for DRI's in some detail.

The Legislature has furnished a general definition of DRI's: "the types of development which, because of their magnitude or the magnitude of their effect on the surrounding environment, are likely to present development issues significant to more than one municipality of the island of Martha's Vineyard." *Id.* § 12.[9] The Commission is

developments of regional impact, and the review thereof by the regional commission.

"Such a program can protect the natural character and beauty of Martha's Vineyard and can contribute to the maintenance of sound local economies and private property values.

"The people of Martha's Vineyard did, on March fourteenth, nineteen hundred and seventy-four vote to endorse the provisions of chapter six hundred and thirty-seven of the acts of nineteen hundred and seventy-four." St. 1977, c. 831, § 1.

[8] The 1977 statute provided that, if the Commission shall adopt regulations for districts of critical planning concern (discussed later in this opinion), four additional members, known as the "town review committee," were to be added. St. 1977, c. 831, § 2, par. 3. The town review committee was abolished by St. 1979, c. 319, § 1.

[9] The statute defines a "development" as "any building, mining, dredging, filling, excavation, or drilling operation; or any material change in the use or appearance of any structure or in the land itself; or the dividing of land into parcels; or a change in the intensity of use of land, such as an increase in the number of dwelling units in a structure; or alteration of a

380 Mass. 785                                                     791

Woods Hole, Martha's Vineyard & Nantucket S.S. Auth. v. Martha's Vineyard Comm'n.

directed to adopt "standards and criteria" for determining DRI's, and the Legislature has designated certain nonexclusive considerations which should enter into these standards and criteria.[10]  *Id.* § 12.  Within each municipality, the governmental agency responsible for issuing development permits (in this case the Tisbury conservation commission, discussed below) must determine, according to the Commission standards and criteria, whether a proposed development is one of regional impact, and if so it must refer the application to the Commission for approval.  *Id.* § 13.

After notice and public hearing pursuant to G. L. c. 30A, § 2 (except that notice may be fourteen days instead of twenty-one), the Commission may grant approval for the local body to grant the development permit only if it finds that:

"(a) the probable benefit from the proposed development will exceed the probable detriment as evaluated pursuant to section fifteen;

"(b) the proposed development will not substantially or unreasonably interfere with the achievement of the objec-

---

shore, beach, seacoast, river, stream, lake, pond, or canal, including coastal construction; or demolition of a structure; or the clearing of land as an adjunct of construction; or the deposit of refuse, solid or liquid waste or fill on a parcel of land."  St. 1977, c. 831, § 6.

[10] "In adopting standards and criteria pursuant to this section, the commission shall consider, but shall not be limited by the following considerations:

"(a) the extent to which a type of development would create or alleviate environmental problems, including, but not limited to, air, water, and noise pollution;

"(b) the size of the site to be developed;

"(c) the amount of pedestrian and vehicular traffic likely to be generated;

"(d) the number of persons likely to be residents, employees, or otherwise present;

"(e) the extent to which a type of development is intended to serve a regional market;

"(f) the location of a type of development near a waterway, publicly-owned land, or a municipal boundary; and

"(g) the extent to which the development would require the provision of the following municipal or regional services:  solid waste disposal, public water supplies, sewage treatment facilities, parking facilities and tourist services, and public education facilities."  *Id.* § 12.

tives of the general plan of any municipality or the general plan of the county of Dukes County;

"(c) the proposed development is consistent with municipal development ordinances and by-laws, or, if it is inconsistent, the inconsistency is necessary to enable a substantial segment of the population of a larger community of which the municipality is a part to secure adequate opportunities for housing, education or recreation; and

"(d) if the proposed development is located in whole or in part within a designated district of critical planning concern, it is consistent with the regulations approved or adopted by the commission pursuant to section ten." *Id.* § 14. The Commission, in making a finding of probable benefits and detriments "shall consider also the impact of the proposed development on the areas within other municipalities. Such probable benefits and detriments shall be considered even if they are indirect, intangible or not readily quantifiable." The statute lists eight factors which the Commission shall weigh, "together with other relevant factors," when assessing probable benefits and detriments. *Id.* § 15. There is no express requirement that the Commission maintain a record of the hearing or state its reasons for approving or disapproving an application, except that it must make the four findings listed above. The Commission may specify conditions under which a development may proceed, *id.* § 16, and has certain enforcement powers, *id.* § 17.

3. *Jurisdiction.* This court may grant declaratory relief only in cases "in which an actual controversy has arisen." G. L. c. 231A, § 1. *Department of Community Affairs* v. *Massachusetts State College Bldg. Auth.*, 378 Mass. 418, 422 (1979). Questions of statutory interpretation, by themselves, do not rise to the level of actual controversy. *Id.* at 422-423, and cases cited. The interests of the parties in this case are identifiable. If we hold that the Commission may not in any circumstance regulate the Authority, the latter will be free to proceed with its construction project. If we hold that this case presents a proper area for Commission regulation, the case will proceed to trial on the validity of the

380 Mass. 785                                    793

Woods Hole, Martha's Vineyard & Nantucket S.S. Auth. *v.* Martha's Vineyard Comm'n.

Commission's action, and the Authority's continuation of the project will proceed either in the manner it desires or in the manner prescribed by the Commission or the trial judge, if he modifies the Commission's decision in any respect. Thus, the Authority has a clear interest in the outcome of our decision. See *id.* at 423.

The Commission's primary interest is in vindicating its authority to protect what it considers to be the values expressed in its enabling act. It has no real financial interest in the outcome of the litigation, since the towns within its jurisdiction and other towns, and not the Commission, are charged with meeting any Authority deficit by St. 1960, c. 701, § 9. We hold that the Commission's interest is sufficient for us to proceed to the merits of this case. See *id.* at 424.

4. *The facts.* We summarize only those facts which are undisputed as shown in the complaint and answer, and the amended complaint and defendant's answer thereto. In December, 1978, the Authority filed with the Tisbury conservation commission (TCC) a statutory notice of intent, as required by G. L. c. 131, § 40 (the Wetlands Protection Act), concerning proposed repairs to its existing facilities in Vineyard Haven Harbor. In January of 1979 the Authority filed a similar notice of intent with regard to its proposed construction of a new ferry slip to act as a "standby slip."[11] As discussed above, the Commission's statute requires all local planning authorities on Martha's Vineyard to determine, according to standards and criteria issued by the Commission, whether a proposed development might be a DRI or might fall within a CPC area.[12] St. 1977, c. 831, § 13. Accordingly, the TCC determined that each of the notices of intent involved developments with potential re-

---

[11] Apparently the two notices of intent were filed separately in order to simplify application for Federal funding.

[12] The Commission had promulgated standards, criteria, and regulations for DRI's which are in the record before us. The Authority maintains that these have no validity because they were not filed with the Secretary of the Commonwealth pursuant to G. L. c. 30A, § 5, an issue which is discussed later in this opinion.

gional impact, and referred the applications to the Commission. On or about April 19, 1979, the Commission conducted a public hearing to consider the applications of the Authority. On May 3, 1979, the Commission voted to approve both projects.

On May 10, 1979, however, the Commission, in its own words, "reconsidered its action of May 3, 1979 and again reviewed the matter of automobile and pedestrian traffic volumes, financing of the project, including the assessment of reconstruction costs against the Island communities in the event of the Applicant's deficit [pursuant to St. 1960, c. 701, § 9], and the regional economic impacts resulting from potential increases in traffic." After "extensive discussion," but no further hearing, the Commission voted to disallow construction of a second slip and allow repair of the existing slip. It found that, in considering the factors enumerated in St. 1977, c. 831, §§ 14, 15, and its own standards and criteria promulgated pursuant to *id.*, § 12, the probable detriments of construction of a second slip would outweigh the probable benefits.

In assessing the probable benefits and detriments, the Commission considered the following factors: (a) "Oak Bluffs and Vineyard Haven serve as major points of entry to the Island during the summer season, and a single slip will insure that Oak Bluffs, which receives 12% of seasonal traffic, will remain economically viable as a port of entry . . ."; (b) "already serious Vineyard Haven traffic conditions will not further degenerate"; (c) future pressures on the Authority to increase the volume of pedestrian and vehicular traffic might have an impact on local economies; and (d) a second slip may affect the business activity of the town of Tisbury. The Commission also was concerned that "[t]he people of Martha's Vineyard are fiscally responsible for deficit spending by the Applicant . . . [and they] could not sustain the extra burden of solely financing the Applicant's proposal."

Accordingly, the Commission allowed the TCC to grant the Authority a development permit "to allow only the re-

380 Mass. 785                                              795

Woods Hole, Martha's Vineyard & Nantucket S.S. Auth. v. Martha's Vineyard Comm'n.

construction of the existing slip."[13]  On July 2, 1979, the
Authority brought suit in Superior Court to obtain declara-
tory and injunctive relief on the principal ground that the
Commission had exceeded its statutory authority.

At oral argument, the Commission moved to supplement
the record. The Authority opposed the motion, but, if it was
to be allowed, the Authority moved further to supplement
the record.  We allow both motions to supplement.  The
supplementary material indicates that the Commission
granted an Authority request to begin construction of a sec-
ond ferry slip, on the basis of an engineer's report that the
existing slip is in serious disrepair and probably will not last
the summer season, and with the understanding that, if the
Commission is ultimately successful in this litigation, the
new slip will be the only one used.

5. *Scope of petition and issues before the court.*  The Au-
thority's petition in the Superior Court combined two sepa-
rate approaches to its alleged right to the relief which it
seeks.  One phase of the petition is an appeal under
St. 1977, c. 831, § 18, from the Commission's decision of
June 7, 1979, authorizing the Authority to reconstruct an
existing ferry slip and related facilities but denying its re-
quest that it be allowed to construct a second or reserve
ferry slip, concluding with a request that the decision be an-
nulled.  Another phase of the petition is a request for declar-
atory relief in the form of a judgment "declaring whether
and to what extent, if any, the [Commission] has jurisdic-
tion over the construction, repair, or maintenance by the
Authority of its property on the Island of Martha's Vineyard
and further declaring whether and to what extent the Com-

---

[13] The Commission also imposed two conditions:  (a) the Authority
"maintain the 'dolly freight' concept" for the convenience of businessmen,
and (b) the Authority not begin construction until the Commission "has re-
viewed the Applicant's plans and specifications [in terms of] criteria iden-
tified in the Commission's Information Lists for Developments of Regional
Impact."  The "dolly freight" system is one whereby consumers and small
businessmen can deliver and pick up freight conveniently at the Vineyard
Haven dock.  The Authority wished to change to an off-site location.

mission's decision dated June 7, 1979 is a lawful exercise, in whole or part, of the Commission's powers."

The Commission by its answer admits some, but not all, of the Authority's factual allegations. After the filing of the answer and before there were any discovery proceedings of record or any trial on the unresolved factual issues, the Authority filed a motion for judgment on the pleadings and a motion for a report of the case without decision to the Appeals Court. The judge of the Superior Court did not act on the motion for judgment, and he allowed the motion to report the case. This court, acting sua sponte, caused the case to be transferred here from the Appeals Court.

We now proceed to a consideration of the several major issues placed before us by the report of the case on the pleadings, limited to the facts alleged by the Authority and admitted by the Commission, without evidence, findings or stipulation of any additional facts.

6. *Appeal by Authority under St. 1977, c. 831, § 18.* Section 18 of the Commission's statute provides in part as follows: "Any party aggrieved by a determination of the commission may appeal to the superior court within twenty days after the commission has sent the development applicant written notice, by certified mail, of its decision and has filed a copy of its decision with the town clerk of the town in which the proposed development is located. The court shall hear all pertinent evidence and shall annul the determination of the commission if it finds that said determination is unsupported by the evidence or exceeds the authority of the commission, or it may remand the case for further action by the commission or may make such other decree as is just and equitable."

The Commission argues that, assuming for the moment that it has the power of regulation over some phases of the Authority's proposed construction or reconstruction project, the case is not ripe for this court to attempt to determine whether the action taken by the Commission in its decision of June 7, 1979, is in excess of its powers or is otherwise invalid. The Authority alleges that the Commission's decision

is invalid for many reasons, some of which are legal in nature, but some of which are factual, including the broad reason that it is allegedly "arbitrary, capricious, is based upon an error of law and is not supported by substantial evidence." It does not appear from the record that the Commission has in any way waived its right to present evidence before the Superior Court on factual issues which must be resolved before this court can pass on some of the alleged grounds of illegality of the Commission's decision. To be sure, the pleadings present some purely legal questions which this court can consider, but unless we conclude that the Commission is entirely without authority to act on the Authority's proposed construction project, and to the extent that there are unresolved factual questions which might have a bearing on the legality of the Commission's decision, we shall transfer the case to the Superior Court for the resolution of those factual questions. That will be in keeping with the language of the Legislature in § 18 of the Commission's statute.

7. *Is land of Authority subject to regulation by Commission?* The answer to this question requires a close examination of the Authority's statute, of the statutes creating other governmental authorities, the relationships between such authorities and other governmental bodies or entities, and decisions of this court interpreting relevant statutes.

A State-created authority is a "hybrid entity, possessing attributes both of a private corporation and of an executive agency of the Commonwealth." *Department of Community Affairs* v. *Massachusetts State College Building Auth.*, 378 Mass. 418, 425 (1979). See *Opinion of the Justices*, 334 Mass. 721, 734-735, 739 (1956). In *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 329 Mass. 243 (1952), decided under the predecessor statute to St. 1960, c. 701,[14] we said of the predecessor Authority that it "is a corporation established as an agency of the Commonwealth to exercise certain delegated govern-

---

[14] St. 1948, c. 544.

mental powers. . . . The powers granted by the Legislature to the Authority as an agency of government are to be exercised free from the control of any other governmental agency unless these powers are made subject to such control by the statute creating the Authority or by some other general or special law." *Id.* at 248-249.

The Authority's statute does not provide for regulation or supervision by the Commission. Therefore, we must determine the question whether the Authority is subject to any control by the Commission by reference to the Commission's statute. The latter statute provides that the Commission "shall be a public body corporate and . . . shall have the responsibilities, duties, and powers established herein over the lands and waters in the county of Dukes County [except certain designated areas, not here relevant] and to the extent they are excluded from the responsibilities, duties and powers of the towns, all lands owned by the commonwealth or any of its constituent agencies, boards, departments, commissions or offices." *Id.* § 2. The Authority argues that it is a "constituent agency" of the Commonwealth and therefore subject to the § 2 exemption.

We have previously faced the question whether a State-created authority is subject to regulation by other State entities. In *Department of Community Affairs, supra* at 428, we held that the Building Authority, created under St. 1963, c. 703, was a "public agency" for purposes of the Relocation Assistance Act, G. L. c. 79A, §§ 1-15. The latter statute provided that "any public agency . . . shall provide relocation assistance . . ." and defined "public agency" to include any "authority." *Id.* § 1. The Building Authority enabling act, however, provided that the Building Authority would not be subject to regulation or supervision by "the department of education or of any department, commission, board, bureau or agency of the commonwealth [with certain inapplicable exceptions]." St. 1963, c. 703, § 2. The enabling act provided, as does the statute creating the Authority in the present case, that any inconsistent general or special law would be inapplicable to the provisions of the act. *Id.* § 24. See St. 1960, c. 701, § 19.

Our reasons for holding that the Building Authority is an agency distinguish that case from the present case, however. First, the statute under which the Department of Community Affairs sought to regulate the Building Authority defined "public agency" to include an "authority." The Commission's statute, under which the Authority seeks exemption, contains no such definition. See St. 1977, c. 831. Second, the Building Authority's statute provided an exemption from regulation. See St. 1963, c. 703, § 2. The Authority's statute contains no such exemption. See St. 1960, c. 701. Because of these differences between the statutes being construed in the *Department of Community Affairs* case and those we are construing here, and because the *Department of Community Affairs* case held the Building Authority to be a public agency only for the purposes at issue therein, we do not regard the *Department of Community Affairs* case as controlling. It does, however, provide precedent for the proposition that an authority may be subject to regulation by another governmental agency.

In *Boston* v. *Massachusetts Port Auth.*, 364 Mass. 639 (1974), we faced the question whether the Massachusetts Port Authority (MPA) was subject to air pollution control regulations of the Department of Public Health and answered the question in the affirmative despite a provision that the MPA "shall not be subject to the . . . regulation . . . of any department . . . of the commonwealth except to the extent and manner provided in this act." *Id.* at 653.

In both the *Massachusetts Port Auth.* case and the *Department of Community Affairs* case, we looked to the entire statutory scheme creating the powers of the agency which was seeking to regulate another State agency, and concluded that the Legislature did not intend to exempt the latter agency from such regulation. 364 Mass. at 655, 658. See 378 Mass. at 432.

The State Administrative Procedure Act defines "agency" as "any department, board, commission, division or authority of the state government or subdivision of any of the foregoing, or official of the state government, authorized by law

to make regulations or to conduct adjudicatory proceedings . . . ." G. L. c. 30A, § 1 (2). The Authority is authorized to make only "by-laws for the regulation of its affairs and the conduct of its business," St. 1960, c. 701, § 4 (*d*), and is not authorized to conduct adjudicatory proceedings. We have consistently recognized the "hybrid" nature of a State authority, and have on occasion likened authorities to municipal corporations. *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 336 Mass. 651, 656, *S. C.*, 358 U.S. 53 (1958); *Opinion of the Justices*, 334 Mass. 721, 735 (1956).

There is no need for the Legislature to amend an authority's enabling statute each time the authority is made subject to regulation by another entity. *Department of Community Affairs, supra* at 432. *Boston* v. *Massachusetts Port Auth., supra* at 654-655. The project which the Authority seeks to undertake in this case, although for a public purpose, could conceivably affect land use and other environmental interests which the Commission was created to protect. We hold that the Authority is not an exempt agency under St. 1977, c. 831, § 2.

It is within the purview of the Authority to repair its existing harbor facilities and construct new ones as necessary. See St. 1960, c. 701, §§ 1, 4. Such projects are subject to approval and regulation by various State, Federal, and local bodies, as is any private development.[15] The Authority cites cases decided by this court under St. 1948, c. 544, holding that it has the power to make certain administrative decisions. See *County of Dukes County* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 333 Mass. 405, 408 (1956); *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 330 Mass. 422, 431 (1953). The Authority also relies on our

---

[15] The record before us illustrates the number of approvals which must be sought from, among others, the Army Corps of Engineers and the State Department of Environmental Quality Engineering. The Authority avers, and the Commission admits, that these approvals have been sought and obtained.

380 Mass. 785                                                     801

Woods Hole, Martha's Vineyard & Nantucket S.S. Auth. v. Martha's Vineyard Comm'n.

statement in *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 329 Mass. 243, 248-249 (1952), that the powers of the Authority "are to be exercised free from the control of any other governmental agency unless these powers are made subject to such control by the statute creating the Authority or by some other general or special law." This statement was made in reference to an attempt by the Department of Public Utilities to regulate the rates of the Authority, however, and St. 1948, c. 544, § 5, set out the procedure for rate setting. Here, the Commission is not seeking to regulate or supervise the Authority; it is simply exercising its power with respect to lands and waters over which it has jurisdiction with respect to development. Nothing in the Authority's enabling act gives it absolute power to construct ferry slips free from any regulation,[16] and we think it is subject to some regulation by the Commission. We turn now to the question of the nature and extent of regulation which is permitted.

8. *Scope of Commission's power over Authority.* As we have already stated above, because the validity of the Commission's decision of June 7, 1979, depends on factual issues which were not resolved by the Superior Court before it reported the Authority's appeal from that decision, we shall not pass on that appeal, but shall remand it to the Superior Court for decision. We take this opportunity, however, to provide some guidance as to what factors the Commission can legitimately consider in ruling on an application, since these questions will arise on remand.

---

[16] In 1956, the Legislature amended the Authority's predecessor statute, St. 1948, c. 544, to add a new § 5A. St. 1956, c. 747. This new section provided among other things that "[t]he Authority shall provide adequate transportation of persons and necessaries of life for the islands of Nantucket and Martha's Vineyard throughout the year . . . and adequate ferry slips or transfer bridges shall be constructed and maintained at [named ports, including Vineyard Haven] to facilitate and accommodate said vehicular traffic." When the predecessor statute was replaced by St. 1960, c. 701, no similar language was included. The present act does authorize the Authority to "construct, maintain and operate necessary vessels, docks, wharves . . . ." St. 1960, c. 701, § 1.

The purpose of the Commission is broadly stated in the enabling act: "to protect the health, safety, and general welfare of island residents and visitors by preserving and conserving . . . the unique natural, historical, ecological, scientific, and cultural values of Martha's Vineyard . . . from development and uses which would impair them, and by promoting the enhancement of sound local economies." St. 1977, c. 831, § 1. To these ends, it has "responsibilities, duties, and powers . . . over the lands and waters in the county of Dukes County [with certain exceptions]." Its regulations for CPC areas may be of the type "adopted by any city or town" under G. L. c. 40, § 8C (conservation commissions); G. L. c. 40A (zoning); G. L. c. 41, §§ 81E-81H (official maps); G. L. c. 41, §§ 81K-81GG (subdivision control); G. L. c. 111, § 27B (regional health boards); and G. L. c. 131, §§ 40, 40A (floodplains and inland wetlands). St. 1977, c. 831, § 3. Regulations may exceed "in their scope and magnitude" local development ordinances "when such ordinances are clearly restrictive of the purposes of the commission." *Id.* Regulation for CPC's are incorporated into a town's ordinances and by-laws. *Id.* Thus the Commission may adopt regulations or specify conditions "which would not otherwise be permitted or required by existing local development ordinances and by-laws, [and in doing so the Commission] shall describe in writing and present evidence which demonstrates that the public health, safety, and welfare would be endangered or that irreversible damage would result to natural, historical, ecological, scientific, or cultural values on Martha's Vineyard by the continuing application of the existing local development ordinance or by-law." *Id.* See *Island Properties, Inc.* v. *Martha's Vineyard Comm'n,* 372 Mass. 216, 229 (1977).

Of the factors which the Commission said it considered in reaching its decision, only one seems to be totally outside its purview under St. 1977, c. 831. That is its consideration of a possible deficit in the Authority's financing of the project, which, if incurred, would have to be assumed by certain towns under St. 1960, c. 701, § 9. The Commission's

statute authorizes the Commission to consider local economies but only in terms of the impact of development and land uses on those economies. That the project may run a deficit which may eventually affect town finances is too tenuous a connection to justify Commission disapproval of the project. See generally *County of Dukes County, supra* at 407-408. We also express some reservation about whether the Commission may require the "dolly freight" system, but leave that to the Superior Court to determine on the evidence.

The other main concern of the Commission, and a theme which runs throughout this litigation, is that the Authority may increase its passenger service and thus bring more people and automobiles onto Martha's Vineyard. This presents a close and complex question. The Authority steadfastly maintains that it has no plans to do so. Furthermore, the Authority contends that St. 1979, c. 102, which mandates annual public hearings on scheduling, governs the question of how much service the Authority will provide. The Commission statute, however, expressly authorizes the Commission to consider "the amount of pedestrian and vehicular traffic likely to be generated" in determining what is a DRI. St. 1977, c. 831, § 12 (*c*). This provision, and the fact that the stated purpose of the Commission to protect "values . . . which contribute to public enjoyment, inspiration and scientific study," *id.* § 1, indicate that the Legislature intended to preserve the unique features of Martha's Vineyard. We emphasize, however, that the present case is one of statutory construction, and we do not here decide other questions such as the constitutionality of restrictions on travel. We note that the validity of the Commission's decision may depend on whether a substantial increase in passenger and vehicular service would affect in a negative manner the "values" it has the power to protect. The question whether and to what extent the Authority will increase service, and the effect of such an increase on the "values" in question, is now a speculative question of future intent which may be resolved by the trial judge at a hearing on the Authority's appeal under St. 1977, c. 831, § 18.

Most of the other factors the Commission said it considered in reaching its decision are, it seems to us, within its authority under St. 1977, c. 831, but we must reserve final decision thereon until we have before us a complete record on appeal from the decision of a judge of the Superior Court pursuant to St. 1977, c. 831, § 18. We stress once again that the trial judge will first have to decide, upon the evidence presented, whether the Commission "determination is unsupported by the evidence or exceeds the authority of the commission, or [he] may remand the case for further action by the commission or may make such other decree as is just and equitable." *Id.* § 18.

9. *Filing with Secretary of the Commonwealth.* The standards, criteria and regulations authorized by St. 1977, c. 831, §§ 7, 12, are not of the type which must be filed with the Secretary of the Commonwealth and published in the Massachusetts Register, pursuant to G. L. c. 30A. They are more analogous to local zoning ordinances and by-laws, except that they are promulgated on a regional basis and then incorporated into town ordinances and by-laws. St. 1977, c. 831, § 3. The Commission's statute provides that the regulations, standards and criteria must be submitted for approval of the Secretary of the Executive Office of Environmental Affairs. *Id.* at § 7. Here, that procedure was followed when the Commission adopted its DRI regulations in 1975.

10. *Conclusion.* Judgment shall enter that the Martha's Vineyard Commission has jurisdiction to regulate proposed development of the Woods Hole, Martha's Vineyard and Nantucket Steamship Authority, and that the Commission need not file its regulations, standards, or criteria with the Secretary of the Commonwealth in order for them to become effective. The case is remanded to the Superior Court for proceedings not inconsistent with this opinion.

*So ordered.*