HENRY THOMAS BALLANTINE, JR., & another *vs.*
TOWN OF FALMOUTH & others.[1]

Barnstable.    December 12, 1972. — January 17, 1973.

Present: HALE, C.J., KEVILLE, & GRANT, JJ.

*Municipal Corporations,* Parking place, Acquisition of property, Lease
of property, Town meeting. *Eminent Domain,* Purpose of taking,
Validity of taking. *Constitutional Law,* Home Rule Amendment.
*Words,* "Public," "Municipal."

Under G. L. c. 40, § 14, as amended by St. 1967, c. 59, § 3, instances of
"municipal" purposes for which a municipality may take land by
eminent domain are limited to those in which the land is to be held,
used and operated for a public purpose by the municipality itself or
conveyed to the Commonwealth for the use of a regional community
college, and land validly taken by a town for "public parking" could
not subsequently be leased by it for use and operation for public
parking by the lessee. [55-56]
A vote of a town meeting to authorize the town's selectmen to lease land
owned by the town for use and operation for public parking by the
lessee, considered as a "by-law" within § 6 of art. 89 of the Amend-
ments to the Massachusetts Constitution, was "inconsistent with"
G. L. c. 40, § 14, as amended by St. 1967, c. 59, § 3, and was
invalid. [56]
A vote passed by a town meeting under an article of the warrant which
authorized the taking by eminent domain of a parcel of land "for
conservation, recreation, public parking and public utilities" pur-
poses, but which did not delineate which portions of the parcel were to
be used for particular purposes, and a vote passed under the
succeeding article of the warrant which authorized the selectmen to
"lease" a certain portion of the parcel for use and operation for public
"parking" by the lessee, were severable, and this court, upon
upholding in a suit in equity the validity of the first vote and deciding
that the second vote was invalid, ordered entry of a final decree
affirming the validity of a taking of the entire parcel for the purposes

---

[1] The other defendants are the board of selectmen of the town of Falmouth, the
Woods Hole, Martha's Vineyard and Nantucket Steamship Authority, and
Joseph Corey, Jr.

stated in the first vote, declaring that the town may hold, use and operate the land for such purposes, and declaring the invalidity of the second vote and that neither the town nor the selectmen may take action thereunder. [57]

BILL IN EQUITY filed in the Superior Court on March 12, 1970.

The suit was heard by *Hudson,* J.

*Andrew F. Lane* for the plaintiffs.

*Henry P. Monaghan* (*Francis W. Keating,* Town Counsel, with him) for the town of Falmouth & others.

GRANT, J.    This case is here on the appeal of the plaintiffs from a final declaratory decree of the Superior Court which determined the validity of certain actions taken by the defendant town of Falmouth (the town) and its board of selectmen in an effort to alleviate a chronic shortage of automobile parking spaces available to the public in the Woods Hole section of the town, particularly in the vicinity of the ferry terminal of the defendant Woods Hole, Martha's Vineyard and Nantucket Steamship Authority (the authority). The trial judge made voluntary findings of fact, and the evidence is reported.

The authority operates a passenger and freight service between the mainland at Woods Hole and the islands of Martha's Vineyard and Nantucket and has its offices and its principal base of operations and ferry terminal in Woods Hole.[2] It has always had a need to provide parking spaces for those of its patrons who leave their automobiles on the mainland while traveling to and from the islands. In 1964 the authority purchased from the New York, New Haven and Hartford Railroad[3] an area, known as the main parking area, which was immediately adjacent to the ferry terminal

---

[2] By the terms of its enabling act (St. 1960, c. 701, as from time to time amended) the authority is constituted a "body corporate" and "a public instrumentality" (§ 3) which is engaged in the "performance of essential governmental functions" (§ 6). See generally *Barnstable* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 343 Mass. 674. The authority has not been accorded the power of eminent domain.

[3] In this opinion the New York, New Haven and Hartford Railroad, the trustees in bankruptcy of that railroad, and the Penn Central Company will all be referred to simply and interchangeably as "the railroad."

and which lay at the extreme southwesterly end of that portion of the railroad's right of way which ran from Buzzard's Bay to Woods Hole. The main parking area was thereafter constructed to provide a capacity of approximately 325 parked automobiles. In 1966 the authority leased from the railroad a portion of the right of way which extended in a northeasterly direction from the main parking area. The leased area, except for a strip twenty feet wide reserved for railroad purposes, was used by the authority to provide parking spaces for approximately 375 additional automobiles. The lease in question was, by its terms, to expire on June 30, 1971, and provided that the area so let could be "used only for the purposes of a vehicular and pedestrian passway and of parking motor vehicles of the [authority] its agents, employees and business invitees."

Since 1965 the defendant Corey has operated the main parking area, and since 1966 he has operated the parking area located on the right of way, for the benefit of the authority under some form of management contract not disclosed by the evidence. Corey has collected parking fees established by the authority from those who have used the two areas for parking purposes. Both areas have occasionally been used by members of the general public who have not been patrons of the authority.

In 1968 the railroad received authorization from the Interstate Commerce Commission (ICC) to abandon that portion of its line of railroad which extended from a point in the center of Falmouth to the main parking area of the authority, a total distance of some 3.34 miles. Such action of the ICC had the effect of freeing for sale by the railroad that portion of its right of way which ran between the same two points in the town, and which will sometimes hereinafter be referred to as the abandoned segment of the right of way. That segment comprises some twenty-five acres and varies in width from 30 to 126 feet. The railroad tracks were subsequently removed therefrom.

On September 13, 1968, the conservation commission of the town (see G. L. c. 40, § 8C, as amended through

St. 1967, c. 885) wrote the defendant selectmen advising them that the commission was interested in having the town acquire a substantial portion of the abandoned segment of the right of way for conservation purposes, including the portion thereof then under lease to the authority and used by it for parking purposes.

On March 18, 1969, the selectmen issued their warrant for a special town meeting to be held on April 2, 1969. Article 1 of that warrant read "[t]o see if the Town will vote to raise and appropriate or appropriate from available funds a sum of money to purchase or take by eminent domain for conservation and other *municipal* purposes that portion of the railroad right of way between Falmouth center and Woods Hole, that has been abandoned for railroad purposes . . . . Said taking to be under the jurisdiction of the Board of Selectmen" (emphasis supplied). Article 2 read "[t]o see if the Town will vote to authorize the . . . Selectmen to negotiate and enter into a *lease* with the [authority] *or others,* to allow the Authority *or others* to continue to use that portion of the railroad right of way now used by *them* for parking . . ." (emphasis supplied).

On March 20, 1969, the railroad advised the town, the authority, the abutters and others who might be interested that it would entertain bids for the purchase of all or parts of the abandoned segment of the right of way. The abutters so notified included the plaintiffs, whose property adjoins the right of way for a distance of some 1,200 feet at the head of Little Harbor in Woods Hole. The plaintiffs and the authority, but not the town, submitted bids for the purchase of the entire abandoned segment.

On March 24, 1969, the finance committee of the town[4] met to consider the foregoing two articles but made no recommendation with respect to either article at that time. Its printed report to the voters in advance of the town meeting recommended under art. 1 that the town raise and appropriate the sum of $60,000 to purchase the abandoned

---

[4] See *Finance Committee of Falmouth* v. *Falmouth Board of Pub. Welfare,* 345 Mass. 579, 580.

segment of the right of way or take it by eminent domain "for conservation, recreation, utilities[5] and *municipal* parking" (emphasis supplied). The printed report also recommended that action under art. 2 be indefinitely postponed, apparently because of doubt as to the legality of a possible lease to the authority. Subsequently, on the floor of the town meeting, the chairman of the committee stated that any such doubt had been resolved in favor of the legality of such a lease and that the committee recommended affirmative action on the motions proposed by the selectmen under both articles.

On April 1, 1969, the authority withdrew its bid for the purchase of the abandoned segment of the right of way, giving as its reason the discovery of an asserted defect in the railroad's title. On the same date the railroad accepted the bid of the plaintiffs, who were advised of such acceptance by letter dated April 4, 1969.

By the time of the special town meeting held on April 2, 1969, the traffic congestion in the public streets in the Woods Hole section of the town during the busy season of the year (from spring until fall) had reached such a condition of congestion that there was room for genuine doubt as to whether fire or other emergency vehicles could proceed through the streets during that season. By that time the authority operated not only the two parking areas already referred to but an additional parking area near the center of Falmouth from and to which it transported its ferry patrons without additional charge to them.

The unanimous vote of the town meeting under art. 1 of the warrant was to authorize the selectmen to purchase or take the abandoned segment of the right of way by eminent domain "for conservation, recreation, *public* parking and public utilities purposes" (emphasis supplied) and to raise and appropriate $60,000 for that purpose. Under art. 2 the town voted to authorize the selectmen to "negotiate and enter into a *lease* with the [authority] *or others,* to allow the

---

[5] It seems reasonably clear that the intended "utilities" were water, drainage, and sewerage facilities to be constructed and operated by the town.

[authority] *or others* to continue to use that portion of the railroad right of way now used by *them* for parking" (emphasis supplied).[6]

By deed dated May 23, 1969, the railroad conveyed the entire abandoned segment of the right of way to the plaintiffs, at the same time assigning to them the 1966 lease between itself and the authority. The plaintiffs were unsuccessful in their efforts to negotiate satisfactory arrangements· with the town or the authority for the future use of any portion of the right of way. By a vote and order of taking adopted on July 25, 1969, the selectmen, acting in behalf of the town, took the fee in the right of way "for conservation, recreation, *public* parking and public utilities purposes" (emphasis supplied). The authority has paved the twenty-foot wide strip formerly reserved for railroad purposes on the portion of the right of way previously leased to it and has thus expanded the total capacity of that area to approximately 525 parking spaces.

Because of the threat or actual pendency of the present litigation the town has not entered into a formal lease arrangement with the authority for the use of any portion of the right of way. Rather, under an informal arrangement apparently agreed to by the parties, the authority has continued to occupy the portion of the right of way originally leased to it in 1966 (plus the area earlier reserved for railroad purposes) and to make periodic payments into an escrow account in the same amounts which it formerly paid to the railroad by way of rent.

The trial judge expressly found that all parties exercised good faith. For this reason we do not explore the indecisive evidence of the motives of the selectmen and the town in their respective actions. See *Caleb Pierce, Inc.* v. *Commonwealth*, 354 Mass. 306, 310-311, and cases cited.

The present proceedings were brought by the plaintiffs under G. L. c. 231A to challenge the validity of the above

---

[6] The annual town report for the year 1969 recites that a motion (presumably worded in the form of the quoted vote) "prevailed." We are not informed of the size of the majority which so voted.

recited actions of the town and to secure various binding determinations of the rights of the parties. The final decree from which the plaintiffs have appealed declares the validity of (1) the votes taken under arts. 1 and 2 of the warrant for the special town meeting, (2) the taking made by the town and (3) the "lease" from the town to the authority of "a portion of said property," as well as the management and operation of that portion by Corey.

We are of opinion that the taking was valid but that the town may not lease to the authority any portion of the property taken.

1. We accept the propositions, agreed to by all parties, that a town's acquisition, holding and operation of off-street parking facilities which are located in congested areas and which are to be made available for use by the general public serve a legitimate public purpose (see *Tate* v. *Malden,* 334 Mass. 507, 508; *Court Street Parking Co.* v. *Boston,* 336 Mass. 224, 229),[7] that a town may legally appropriate money for that purpose (see G. L. c. 40, § 5, cl. 33 [as amended through St. 1946, c. 358, § 9]; G. L. c. 40, §§ 22B and 22C, as most recently amended), and that a town may proceed under the provisions of G. L. c. 40, § 14 (as most recently amended by St. 1967, c. 59, § 3) to exercise the power of eminent domain (*Burnham* v. *Mayor & Aldermen of Beverly,* 309 Mass. 388, 392-394) in order to acquire the land necessary to establish such facilities. The parties also appear to be in agreement on the general proposition that a town may lease to a private party for a relatively short period of time and on a nondiscriminatory basis a parcel of land or a building already held by the town but not presently used or needed for any public purpose. See, e. g., *D. N. Kelley & Son, Inc.* v. *Selectmen of Fairhaven,* 294 Mass. 570, 574-575, and cases cited. Cf.

---

[7] Although not here directly involved, it would seem that the defendant authority enjoys a like power to acquire and operate off-street parking facilities for use by that portion of the general public which patronizes its ferry facilities. See *Massachusetts Port Authy.* v. *Clerk of the East Boston District Court,* 350 Mass. 195.

*Cape Cod S.S. Co.* v. *Selectmen of Provincetown,* 295 Mass. 65, 68.

However, the plaintiffs and we part company with the defendants when they argue that a town, having once taken land by eminent domain, may immediately proceed under G. L. c. 40, § 3,[8] to lease the same land to an entity such as the authority in this case. It would be but a logical extension of that argument to say that the provisions of G. L. c. 40, §§ 3 and 14,[9] should be read together in such fashion as to permit the town in this case to take the land of the plaintiffs in one legislative breath and in the next lease that land to a private individual such as the defendant Corey, a possibility not altogether excluded by the literal wording of the vote adopted under art. 2 of the warrant in this case. The existence of just such a possibility was the decisive factor against the constitutionality of the takings considered in *Salisbury Land & Improvement Co.* v. *Commonwealth,* 215 Mass. 371, where the conclusion was reached that a general power to take land by eminent domain could not be coupled with a general power to dispose of such land by sale or lease to private parties unless there should be an intervening requirement of an official

---

[8] The portions of § 3 which are or may be material to this argument are as follows: "A town may hold real estate for the public use of its inhabitants and may convey the same by deed of its selectmen thereto duly authorized . . .; may by its selectmen let or lease for not more than five years, on such terms as the selectmen determine, a public building or part thereof, except school houses in actual use as such; . . . and may make such orders as it may deem necessary or expedient for the disposal or use of its corporate property. . . ."

[9] The first paragraph of § 14 provides in pertinent part as follows: ". . . the selectmen of a town may purchase, or take by eminent domain under chapter seventy-nine, any land . . . not already appropriated to *public use,* for any *municipal purpose* for which the purchase or taking of land . . . is not otherwise authorized or directed by statute; but no land . . . shall be taken or purchased under this section unless the taking or purchase thereof has previously been authorized . . . by vote of the town, nor until an appropriation of money, to be raised by loan or otherwise, has been made for the purpose . . . by a two thirds vote of the town. . . ." (emphasis supplied). The second paragraph of that section was inserted by St. 1967, c. 59, § 3, and reads as follows: "The words '*municipal purpose,*' as used in this section, shall include any such land . . . within the . . . town, so purchased or taken by eminent domain for the purpose of conveying or granting the same to the commonwealth for the use of a regional community college" (emphasis supplied). By St. 1967, c. 59, § 4, the Legislature expressly validated takings theretofore made by towns for the purpose set out in the new second paragraph of § 14.

determination that such land was no longer needed for the public purposes for which it had been taken (pp. 374-378).

We believe that it has been a consideration of the problem just discussed which has led the Legislature either (1) itself to identify the particular instances in which a town may (a) take land for the purpose of conveying it to another public entity (see *Merrymount Co.* v. *Metropolitan District Commission,* 272 Mass. 457) or (b) dispose of land so taken by way of sale or lease to private parties (see *Wright* v. *Walcott,* 238 Mass. 432) or (2) to enact general provisions to the effect that land taken by eminent domain may not be disposed of, or even devoted to another public use, unless or until the proper public official or body has determined that such land is no longer necessary for the purpose for which it was taken. See G. L. c. 40, §§ 15, 15A, 15B; G. L. c. 81, § 7E; and the statutory provisions discussed in the *Salisbury Beach* case (215 Mass. at 377-378). See also *Belmont* v. *Massachusetts Amusement Corp.* 333 Mass. 565, 567-569; *Bouchard* v. *Haverhill,* 342 Mass. 1. Compare G. L. c. 132A, § 3.

It is with this background in mind that we approach the problem of construing the provisions of G. L. c. 40, § 14, which is the only source of the power of eminent domain available to the town in this case. The precise question is whether a town's taking of land for the use or benefit of another public entity is a taking for a "municipal purpose" within the meaning of that section. We must recognize that the word "municipal" is to be distinguished from and given a considerably narrower meaning than the word "public" which also appears in the first paragraph of the section. *Ouellet* v. *Board of Appeals of Dover,* 355 Mass. 77, 78. The second paragraph identifies the only instance in which the Legislature has expressly permitted a town to raise money by taxation and to exercise the power of eminent domain for the purpose of acquiring land for the benefit of another public entity, namely, "for the purpose of conveying or granting the same to the commonwealth for the use of a regional community college." It is our view that the only practical means of avoiding the constitutional problem

which has been discussed, of bringing § 14 into harmony with the general scheme of the other statutory provisions already referred to, and of effectuating the distinction between the words "municipal" and "public" is to hold, as we do, that it was the intention of the Legislature in enacting that section, and particularly the second paragraph thereof, to limit the instances of "municipal" purposes for which a town may take land by eminent domain to those in which the land is to be held, used and operated for a public purpose by the town itself and those in which the land is to be taken for the purpose of conveying it to the Commonwealth for the one use stated.

Our conclusion is that the Legislature must be taken to have forbidden the town to take the land of the plaintiffs in this case by eminent domain for the purpose of establishing off-street parking facilities which are not to be held, used and operated by the town itself. It follows that the town may not lease any land so taken to the authority.[10]

2. The town urges that it was empowered by § 6 of art. 89 of .the amendments to the Constitution of the Commonwealth (sometimes known as the Home Rule Amendment) to take the action represented by the vote adopted under art. 2 at the special town meeting held on April 2, 1969. Even if we were to consider that vote as an "ordinance or by-law" within the meaning of § 6 (see *Brucato* v. *Lawrence,* 338 Mass. 612, 618-619), it would be at variance with the construction we have placed on G. L. c. 40, § 14, as amended, and would thus be "inconsistent with . . . laws enacted by the general court" within the meaning of said § 6. See *Chief of Police of Dracut* v. *Dracut,* 357 Mass. 492, 496-498; G. L. c. 43B, § 13, as inserted by St. 1966, c. 734, § 1.

---

[10] We pass by the contention that the town could have acted under the general introductory clause of G. L. c. 40, § 4, to enter into a contract with the authority for the operation by it of the parking area in question, for the only action which the selectmen were authorized to take by the vote adopted under art. 2 of the warrant was through the medium of a lease to the authority. We express no opinion on whether the town could achieve its basic objective under the provisions of said § 4 or under those of G. L. c. 40, § 4D, inserted by St. 1967, c. 883, § 1.

3. The vote under art. 1 of the warrant was to authorize the taking of the entire abandoned segment of the right of way, not merely the portion thereof then held and occupied by the authority for the parking of automobiles. The purposes for which the right of way was to be acquired were stated as "conservation, recreation . . . and public utilities" as well as "public parking." The vote did not purport to delineate which portions of the right of way should be used for particular purposes, but various photographs and plans in evidence strongly suggest that substantial portions of the right of way not used for the parking of automobiles are suitable for use for conservation, recreation and the installation of the contemplated utilities. The town is in obvious need of additional automobile parking spaces for the use of the public in the Woods Hole section, and no substantial reason appears why the town could not itself operate the area already devoted to that use.

We hold that the votes are severable and uphold the validity of the separate and unanimous vote which authorized the taking. See *Quinlan* v. *Cambridge,* 320 Mass. 124, 132; *Doliner* v. *Town Clerk of Millis,* 343 Mass. 10, 14-15. No irregularity having been shown in the vote and order of taking adopted by the selectmen, or in the execution of the material requirements of G. L. c. 79, it follows that the validity of the taking of the land of the plaintiffs must also be upheld.

The final decree is reversed. A new final decree is to be entered which (1) affirms the validity of the town's taking of the land described in the order of taking recorded in the registry of deeds for Barnstable County in book 1444, page 145, (2) declares that the town may hold, use and operate the land so taken for any or all of the purposes stated in said order (as the town shall see fit), but (3) declares the invalidity of the vote adopted under art. 2 of the warrant for the special town meeting held on April 2, 1969, and that neither the town nor its selectmen may take action thereunder.

*So ordered.*