Town of Bourne & another[1] vs. Ernest A. Plante, Jr., & another,[2] trustees[3]; Woods Hole, Martha's Vineyard and Nantucket Steamship Authority, intervener.

Barnstable. March 5, 1999. - April 9, 1999.

Present: Wilkins, C.J., Abrams, Lynch, Greaney, Fried, & Ireland, JJ.

*Woods Hole, Martha's Vineyard and Nantucket Steamship Authority. Practice, Civil,* Preliminary injunction. *Zoning,* Public authority, Parking, Parking area. *Statute,* Construction.

The enabling legislation (St. 1960, c. 701, as amended by St. 1965, c. 437) of the Wood's Hole, Martha's Vineyard and Nantucket Steamship Authority granted the Authority the power to meet the peak demand for parking for its patrons by leasing property off-site, and such use was not subject to municipal zoning regulations. [332-335]

Civil action commenced in the Superior Court Department on July 31, 1998.

A motion for preliminary injunction was heard by *Robert A. Mulligan,* J. A petition for interlocutory relief was heard in the Appeals Court by *Phillip Rapoza,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert S. Troy (Brian J. Wall* with him) for the plaintiffs.

*Richard M. Zielinski (Michael D. Vhay & Steven M. Sayers* with him) for the intervener.

*Alexander M. Joyce,* for the defendants, was present but did not argue.

Greaney, J. We granted the plaintiffs' application for direct appellate review in this case to consider the propriety of a preliminary injunction entered in the Superior Court. The injunction enjoined the defendants, Ernest A. Plante, Jr., and Dolores A. Plante (defendants), and the intervener, the Woods Hole,

[1]The building inspector of Bourne.
[2]Delores A. Plante.
[3]Of the Bourne Business Center Condominium Trust.

Martha's Vineyard and Nantucket Steamship Authority (Authority), from using the property at 169 Clay Pond Road in Bourne under a lease to provide weekend parking for patrons using the Authority's services. We conclude that the preliminary injunction must be vacated.

The background of the case is as follows. The Authority was created by St. 1960, c. 701, as a "public instrumentality" which is to "provide adequate transportation of persons and necessaries of life for the islands of Nantucket and Martha's Vineyard." St. 1960, c. 701, §§ 1, 3. The Authority's principal offices are located in Woods Hole which is also the mainland terminal for its passenger services to Martha's Vineyard. Over the past thirty years, demand for the Authority's service to Martha's Vineyard has risen dramatically, from carrying 432,478 passengers, 82,897 automobiles, and 9,792 trucks in 1965, to carrying 2,139,599 passengers, 368,539 automobiles, and 64,777 trucks in 1995.

Providing adequate parking on the mainland for its patrons who do not take their motor vehicles to the islands has been a persistent problem for the Authority. When the Authority was created in 1960, it owned only one parking lot in Woods Hole. Over the years, as traffic and the number of patrons have dramatically increased, the Authority has purchased or leased additional property in Falmouth and has provided shuttle bus service for its passengers between its off-site parking lots and the Woods Hole terminal.

In 1995, the Authority found that its Woods Hole and Falmouth parking facilities were inadequate to meet its needs during the peak summer weekends. Patrons who were unable to park their vehicles at the Authority's lots left them on side roads or circled through the streets of Falmouth and Woods Hole. The problem came to a head during the 1995 Independence Day weekend, when all of the Authority's lots quickly filled up and passengers continued to arrive in unprecedented numbers. The principal route to the Woods Hole terminal, Woods Hole Road, became "an extended parking lot" and "bottlenecked traffic all but closed Water Street" as well. "Tempers flared early and often throughout the day," while passengers waited ninety minutes in shuttle buses to travel the final one-quarter mile to the terminal.

The Authority proceeded to take immediate steps to address its parking needs by searching for a suitable location on the

outskirts of Falmouth where it could consolidate its "overflow" parking lots and add more parking spaces to accommodate expected traffic growth. The most acceptable consolidated site is at the Massachusetts Military Reservation (formerly Otis Air Force Base). The Authority has worked to secure an off-site parking facility at this site, but as of August, 1998, no final agreement had been reached to permit parking there.

Until the Authority obtains approval of a parking facility at the military reservation or somewhere else having similar location and size, it must use smaller parking facilities to satisfy the needs of its patrons. To this end, the Authority has leased two properties in Bourne for weekend overflow parking. On March 6, 1998, the Authority executed a lease with the defendant, Ernest A. Plante, Jr., for a term commencing on May 10, 1998, and ending on September 10, 1998, to use Plante's property at 169 Clay Pond Road in Bourne (comprising about six acres) for weekend overflow parking.[4] On July 9, 1998, the plaintiff, building inspector of Bourne, ordered Plante to cease and desist from using 169 Clay Pond Road "for commuter parking (i.e. steamship parking)" because the use was "in violation of the . . . Bourne Zoning Bylaws."

Efforts to resolve the controversy were unsuccessful, and on July 31, 1998, the plaintiffs filed a verified complaint in the Superior Court alleging that the defendants had violated certain provisions of the Bourne zoning bylaw by leasing the site for an unlawful parking use, and by filling and clearing the lot in violation of the approved site plan. The Authority was permitted to intervene in the case. After hearing, a judge in the Superior Court entered a preliminary injunction enjoining the use of the leased property for parking. The Authority filed a petition for interlocutory relief from the preliminary injunction with the Appeals Court pursuant to G. L. c. 231, § 118, first par. After hearing, a single justice of the Appeals Court entered an order vacating the preliminary injunction. The plaintiffs filed a timely appeal from the order of the single justice, and we granted their application for direct appellate review.

---

[4]The lease has expired, but no one has suggested the case has become moot undoubtedly because the question presented is an important one which will arise again when the Authority seeks to resolve systemic parking problems by leasing private property during seasonable peak times and local municipalities assert the right to make their zoning ordinances or bylaws applicable to the leases.

The plaintiffs' arguments in support of the preliminary injunction are relatively straightforward. They concede that the Authority has seen a significant increase in demand for ferry service, that the level of service has expanded, and note that the Authority has increased the number of parking spaces available in response. The plaintiffs maintain, however, that the Authority's enabling legislation, St. 1960, c. 701, allows it, in their words, "to authorize a ferry service and nothing more." Thus, the plaintiffs conclude that, because "[m]aintenance of a satellite parking lot system has never been part of the Authority's mission," the Authority cannot enter into parking arrangements that may violate local zoning ordinances or bylaws, and if the Authority attempts to do so, it is acting ultra vires. We are satisfied that the Authority need not comply with local zoning when it leases private property for parking. Consequently, there is no basis in law to support a preliminary injunction.

"[A]n entity or agency created by the Massachusetts Legislature is immune from municipal zoning regulations (absent statutory provision to the contrary) at least in so far as that entity or agency is performing an essential governmental function." *County Comm'rs of Bristol* v. *Conservation Comm'n of Dartmouth*, 380 Mass. 706, 710 (1980) (*Bristol*). The scope of the immunity is broad and applies not only to property and facilities owned by the entity or agency, but also to leased property and facilities. *Id.* at 713. The immunity extends beyond the "essential governmental function" to cover "action reasonably related to that function" so that the agency's or entity's public mission is not "prevented by a zoning statute applicable to one municipality or by a local zoning ordinance or by-law." *Village on the Hill, Inc.* v. *Massachusetts Turnpike Auth.*, 348 Mass. 107, 118 (1964), cert. denied, 380 U.S. 955 (1965).

As mentioned, the Authority is a public instrumentality which has been directed by the Legislature "to provide adequate transportation of persons and necessaries of life for the islands of Nantucket and Martha's Vineyard." St. 1960, c. 701, § 1. To this end, the Legislature has expressly granted the Authority the power to (1) "acquire, maintain, repair and operate a boat line," *id.* at § 4 (*a*), as amended by St. 1965, c. 437; (2) "acquire, hold and dispose of real and personal property . . . for its corporate purposes," *id.* at § 4 (*e*); (3) "make and enter into all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers under

this act," *id.* at § 4 (*f*); and (4) "do all acts and things neces-
sary or convenient to carry out the powers expressly granted in
this act," *id.* at § 4 (*g*). The legislation provides that its provi-
sions are to be liberally construed, *id.* at § 17, and there is
nothing therein which even remotely suggests that Bourne, or
any other municipality, is to have a veto power over the
Authority's operation and maintenance of the boat line and
related aspects of its operations. See *Bristol, supra* at 713
("when the Legislature has intended to confer a 'municipal
veto' upon action taken by an entity or agency performing an
essential governmental function it has done so in unmistakable
terms").

The plaintiffs would have us conclude that the Authority has
only a narrow governmental purpose which must focus solely
on the needs of the permanent residents and economies of Mar-
tha's Vineyard and Nantucket and not on the needs of summer
residents, tourists, and others who make use of the Authority's
services. This interpretation is based on a stunted reading of the
Authority's enabling legislation and overlooks pertinent
precedent.

In *New Bedford* v. *New Bedford, Woods Hole, Martha's
Vineyard & Nantucket S.S. Auth.*, 330 Mass. 422, 428 (1953)
(*New Bedford*), we discussed the purpose of the predecessor
entity to the Authority. We noted that the permanent populations
of the islands are small, that "[n]either island is industrialized,"
that "[n]either can boast of any considerable amount of general
agriculture or of natural resources," and that "[n]either produces
enough to supply its inhabitants more than a small fraction of
the necessities of civilized living." We stated that "both islands
enjoy a summer climate which, together with ample means of
recreation on land and sea, has attracted a great many people as
summer visitors, so that the entertainment of vacationists has
become a large industry." *Id.* We went on to say the following:
"It is apparent, however, from facts of common knowledge and
may be taken as established, that the volume of business handled
by the [A]uthority, as to both passengers and freight, is and will
remain highly seasonal in character, varying from the needs of a
small permanent population on the islands in the winter to the
needs of a summer population many times larger. It is further
apparent that steamboat service is vital to the economic survival
of the islands at all seasons, but is not a matter of life or death
to either Falmouth or [other mainland municipalities]." *Id.* at

430. These observations remain relevant today. The burden placed on the Authority to meet the demand placed on its services during the summer season is many times what the predecessor Authority had to contend with in 1953, when the *New Bedford* decision was written.

In 1973, the Appeals Court and this court commented on the Authority's parking needs. In *Ballantine* v. *Falmouth*, 1 Mass. App. Ct. 47, 48 (1973), in reversing a Superior Court decree, the Appeals Court stated that the Authority "has always had a need to provide parking spaces for those of its patrons who leave their automobiles on the mainland while traveling to and from the islands." The Appeals Court then went on to state that "it would seem that the . . . [A]uthority enjoys a . . . power to acquire and operate off-street parking facilities for use by that portion of the general public which patronizes its ferry facilities."[5] *Id.* at 53 n.7, citing *Massachusetts Port Auth.* v. *Clerk of the E. Boston Dist. Court*, 350 Mass. 195 (1966). On further appellate review, in *Ballantine* v. *Falmouth*, 363 Mass. 760, 762 (1973), we took note of the fact that passengers using the Authority's services had created "a considerable demand for parking," and that to meet this demand, the Authority was providing off-site parking, including parking at an area several miles from its Woods Hole dock. While neither of these decisions dealt directly with the issue before us, they both acknowledged the Authority's history of furnishing parking for its patrons who chose not to transport their vehicles to the islands.

There is no question that the Legislature has entrusted exclusive management of the boat line to the Authority, and that the Authority's management power "includes, as it must in the case of any transportation enterprise, power to adapt the service furnished to the amount of traffic offered." *New Bedford, supra* at 431. Based on the provisions of the legislation conferring broad management power on the Authority, the statutory provision permitting the Authority to acquire real property and to enter into contracts and agreements, the statutory provision conferring on the Authority the ability to "do all acts and things necessary or convenient to carry out [its] powers," St. 1960, c. 701, § 4 (*g*), the further statutory provision requiring that the powers granted to the Authority to execute its mission be

---

[5]Our decision in *Ballantine* v. *Falmouth*, 363 Mass. 760 (1973), affirmed the Superior Court decision on a point not applicable to this case.

construed liberally, the case law, and the Authority's demon-
strated acute need for off-site parking during peak periods, we
have no difficulty in concluding that the Authority's choice to
provide off-site parking is directly and inextricably linked to its
mission. As a consequence, the Authority can lawfully execute
the lease in issue without complying with requirements of the
Bourne zoning bylaw that might otherwise apply. Thus, the
plaintiffs' main argument fails. The plaintiffs' subsidiary argu-
ments — that the Authority cannot engage in a "proprietary
function" (namely, permit parking for a fee), that the Authority
should rely on the private sector for parking, and that the
Authority's parking needs should be left to local government
for resolution — are also rendered academic by reason of the
considerations set forth above.

The preliminary injunction entered in the Superior Court is
vacated, and the case is remanded to that court for further
proceedings.

*So ordered.*