Borenstein, J.
I. INTRODUCTION
Plaintiff Greater Lawrence Sanitary District (GLSD) and defendant New England Fertilizer Company (NEFCO) brought this action based on defendant Town of North Andover’s (North Andover) refusal to grant a site assignment for construction of a new wastewater treatment facility in North Andover by GLSD.[3] This matter is before the Court on plaintiff GLSD and defendant NEFCO’s joint motion for summary judgment on all counts of the complaint.[4] The dispositive issue is whether North Andover or the Department of Environmental Protection (DEP) has the authority to grant or deny a site assignment for GLSD’s new facility.[5] After several hearings and for the reasons set forth below, GLSD and NEFCO’s motion for summary judgment is ALLOWED as to Counts I, II, III, VI, and VII. For the reasons set forth in the Commonwealth’s Motion to Dismiss, the DEP, Department of Public Safety, and Department of Public Health are hereby DISMISSED as defendants. As a result of the dismissal of these parties, Counts IV and V of the complaint are hereby DISMISSED.

II. BACKGROUND

GLSD is a water pollution control district established by the Legislature in 1968. See 1968 Mass. Acts ch. 750. The 1968 enabling act (the Act) gave GLSD responsibility for planning, building, and operating a facility to treat wastewater of member communities. The Act designated GLSD a body politic and corporate. GLSD’s membership includes the cities of Lawrence *572 and Methuen, the towns of North Andover and Andover, and the town of Salem, New Hampshire.[6] The GLSD commission, made up of seven voting members, governs the GLSD.[7] In 1977, GLSD began receiving wastewater from member communities and disposing of the resulting wastewater sludge through the use of on-site sludge incinerators. The site of the GLSD wastewater treatment facility in the town of North Andover was assigned by the Department of Public Health. G.L.c. 83, §6. In 1975, the Legislature designated the DEP as the agency responsible for issuing site assignments under §6. Mass. Stat. 1975, c. 706, §116.
GLSD’s early efforts at safe disposal of wastewater resulted in odor and water pollution problems. In 1988, the Attorney General filed suit against GLSD under the Massachusetts Clean Water and Clean Air Acts, claiming that GLSD was exceeding allowable effluent discharge limits into the Merrimack River, and also that GLSD’s facility had created significant odor problems. GLSD and the Commonwealth entered into an agreement requiring GLSD to update and improve its facilities in compliance with federal and state requirements for wastewater treatment and processing. Part of this agreement called for GLSD to install odor control equipment and additional facilities for sludge thickening and storage.
Since 1988, GLSD has used various short-term remedies for transportation and disposal of wastewater sludge. None of these remedies are viable for the long term due to cost and other concerns. The current practice is to remove the treated sludge[8] in commercial trucks, which requires the sludge be trucked through the streets of North Andover on its way to various landfills, incinerators, and composting facilities, at a cost of approximately $4.5 million a year.
Using the services of various engineering firms, GLSD developed a plan for a new facility as a remedy for its sludge disposal problems. In 1993, GLSD entered into a contract with the successful low bidder for the construction of a new facility in North Andover. The design fully complied with the applicable state and federal requirements.
Between 1993 and 1995, GLSD and North Andover were involved in several lawsuits concerning the construction of the new facility. In 1995, with no agreement reached between the parties, GLSD cancelled the engineering contract and began anew to develop plans for a treatment facility. The basis for this current lawsuit began in 1996. As part of this planning process, sludge management alternatives were identified and evaluated with regard to cost, complexity, environmental concerns, and traffic issues. This evaluation process resulted in a final Facilities Plan/Environmental Impact (FP/EIR) Report. In addition, an Environmental Impact Report (FIR) was prepared pursuant to the Massachusetts Environmental Policy Act (MEPA).
In 1997. the Legislature passed an act authorizing GLSD to enter into contracts for the construction of a biosolids processing facility. 1997 Mass. Acts ch. 213. Subsequently, the FP/EIR made its way through the administrative process, and after the public review period a final FP/EIR was completed. This FP/EIR recommended the construction and operation of a sludge thickening and de-watering facility, along with anaerobic digestion and odor control of the treated wastewater. These actions resulted in a new plan for what is referred to as the Contract I facility.[9]
The final FP/EIR also recommended a thermal drying facility for the treated sludge, which was designated the Contract II facility.[10] The Contract II facility would result in an end product that would be sold as fertilizer pellets. This process would eliminate the need for removing the sludge from the site, and the end product would comply with all pathogen, pollutant and vector attraction reduction requirements under federal and state regulations.
The Contract I and II facilities have been approved by the DEP, the Town of North Andover Conservation Commission, and the Federal Aviation Administration. [11] In addition, the Massachusetts Executive Office of Environmental Affairs approved the FP/EIR. The DEP issued a site assignment to GLSD for the project, said site being GLSD’s property located in North Andover. During the development of the project, North Andover’s representative to the GLSD commission expressed support for the project, continually voted in favor of the project, and represented to the GLSD commission that North Andover supported the project. Also during development of the project, North Andover required GLSD to pay various fees, including host community fees, fees pursuant to G.L.c. 16, §24B, zoning control fees, monitoring fees, and payments in lieu of taxes. One fee which appears to have generated significant acrimony between the parties was a fee for an application for building permits. In connection with the building permits came a request from North Andover that GLSD apply to it for a site assignment and pay the accompanying fee.
Without conceding that North Andover had any authority to issue or deny it a site assignment for the Contract I and II facilities, GLSD entered into intense negotiations with North Andover in an effort to settle any disputes between the parties. These negotiations resulted in the execution of an initial Memorandum of Understanding (“initial MOU”) in March of 2000, signed by the North Andover board of selectmen, two members of the North Andover board of health and five members of the GLSD commission. The agreement clearly indicates disagreement as to whether G.L.c. 83, §6 or G.L.c. 111, §143 governs the granting of a site assignment for the proposed facilities.
The initial MOU states that by entering into the agreement, neither party waived any rights, but that a “voluntary and cooperative public process” for re *573 sponding to environmental concerns was in the best interests of the public. The agreement called for the parties to discuss the applicable site assignment process and for the parties to address environmental and public health and safety concerns. GLSD also agreed to provide further documents for North Andover’s technical adviser to review, and North Andover was to then inform GLSD in a timely manner of any new concerns[12] North Andover had as a result of this review.
Shortly after the initial MOU was executed, North Andover issued a building permit for the Contract I facility.[13] On or about June 18, 2000, North Andover issued a building permit for the Contract II facility. Both building permits state that they are contingent on approval from the Town’s Board of Health and are subject to any conditions imposed by the Board of Health. On June 19, 2000, the Board of Health voted to approve the Contract I facility, but not the Contract II facility. The building permits require that construction begin within six months from the date the permit was issued. The permit for the Contract II facility expired on December 18, 2000.
On June 29, 2000, North Andover issued a final MOU, which was delivered to the GLSD in July of 2000. This MOU did not specify in writing, as required by the initial MOU, the impact on North Andover in the categories of air quality, odor, noise, and traffic, nor were the appropriate mitigation measures North Andover was proposing specified in writing as required. The complaint which began the present litigation between the parties was filed on July 26, 2000, apparently in response to the final MOU.

111. DISCUSSION

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c). The existence of disputed facts is consequential only if those facts have a material bearing on the disposition of the case. Norwood v. Adams-Russell Co., 401 Mass. 677, 683 (1988). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion for summary judgment.” Pederson v. Time, Inc. 404 Mass. 14, 17 (1989). Within this analytical framework, the Court addresses the plaintiffs’ contentions.
A. Authority to Grant a Site Assignment for Wastewater Treatment Plants
The dispositive issue for purposes of this motion, and an area of great disagreement between the parties, involves determining which governmental entity has ultimate authority to grant or deny a site assignment for wastewater treatment plants. The plaintiffs argue that pursuant to G.L.c. 83, §6, the DEP has exclusive authority to grant site assignments for all wastewater treatment facilities in the Commonwealth.[14] The defendants assert that the North Andover Board of Health has the exclusive authority under G.L.c. 111, §143.[15]
1. The DEP Has Plenary Authority Over the Granting of Site Assignments for Wastewater Treatment Facilities
The plaintiff argues that the DEP’s authority here is plenary as it comprises part of a comprehensive statutory scheme designed to regulate wastewater treatment facilities. North Andover asserts that since no statute strips it of authority to regulate the Contract II facility under §143, it must have the authority.
The meaning of a statute must be ascertained by examining the entire statutory scheme. Pereira v. New England LNG Co. Inc., 364 Mass. 109, 121 (1973) (recognizing that the statutes in question there worked together to give the Department of Public Utilities the authority to insure the availability of vital services). Moreover, “legislative intent to bar local action may be inferred where ‘the local regulation would somehow frustrate the purpose of the statute so as to warrant an inference that the Legislature intended to preempt the subject.’ ” Fafard v. Conservation Commission of Barnstable, 432 Mass. 194, 200 (2000), citing Boston Gas Co. v. Newton, 425 Mass. 697, 699 (1997).
Pereira provides guidance to this Court as it involved a conflict between the state Department of Public Utilities and the City of Fall River. Pereira, 364 Mass. at 112-13. The Department had granted the defendant a permit for a liquid natural gas facility and exempted the facility from local zoning ordinances from which the City appealed. Id. In ruling that the defendant need only have the approval of the Department and not the City, the Court gave weight to a statutory scheme showing that the Legislature intended a “broad and balanced consideration of all aspects of the general public interest and welfare and not merely examination of the local and individual interests which might be affected.” Id. at 119. The Court additionally reasoned that the state scheme incorporates a mechanism for the state agency to examine and respond to local concerns, and important local issues would still be addressed even without local control. Id.
As in Pereira, the process in this case provided for consideration and examination of local issues and concerns by the DEP, MEPA, FAA, Massachusetts Executive Office of Environmental Affairs, as well as the Town’s own Conservation Commission. In addition, the Town gave input to these agencies through both written materials and participation in meetings and hearings. The overarching principle in the process, however, is that the interests and welfare of the general public cannot be surpassed by local interests and concerns. The Town here was and is entitled to have its interests and welfare examined and evaluated *574 by state agencies, but is not necessarily entitled to prevail.
Also similar to Pereira, the statutes in this case pertaining to wastewater treatment facilities contain a comprehensive, detailed statutory scheme. The enabling Act of 1968 designated the GLSD as a “body politic and corporate,” created for the purpose of planning, building and operating facilities for the disposal of wastewater generated by member towns. 1968 Mass. Acts ch. 750, §§1, 2, 5, 7, 10. The Act required that GLSD receive approval from the state division of water pollution control, part of the DEP, for any proposed water pollution abatement plan. 1968 Mass. Acts ch. 750, §4. Perhaps most tellingly, the Act expressly granted the DEP authority to “supervise the operation and maintenance of the facilities of the district,” as well as the power to “take such remedial action as may be necessary to maintain required standards.” Id. at §7.
In 1997, the Legislature again acted and expressly stated that the biosolids facility[16] of GLSD be located at GLSD’s wastewater treatment plant in the town of North Andover. 1997 Mass. Acts ch. 213, §1. The 1997 legislation also contained other details relating to construction of a new facility at the North Andover site. For example, the Act authorized GLSD to contract with a single firm to design, build, and operate the facility, which exempted GLSD from the constraints of public bidding, and also ensured GLSD’s eligibility for future state financial assistance.
Sections 6 and 7 of chapter 83 are likewise pieces of a comprehensive statutory scheme for the treatment and disposal of wastewater in the Commonwealth. Section 6 requires DEP approval for the acquisition of all land “for the treatment, purification and disposal of sewage.” G.L.c. 83, §6. Section 7 confers on the DEP authority to require an operator of a sewage treatment works to improve its facility, and even allows the DEP to close down an operation entirely. G.L.c. 83, §7.
Under the Massachusetts Clean Waters Act, chapter 21, §§26-53, the DEP’s division of water pollution control (the division) is charged with the “prevention, control and abatement of water pollution.” G.L.c. 21, §27. The division is responsible for both the operation and maintenance of treatment works, and has the power to regulate waste treatment facilities. G.L.c. 21, §§27, 34. Moreover, towns and districts are required to obtain approval from the DEP prior to implementing any plan for sewage disposal. G.L.c. 111, §17. The division likewise has a significant role in coordinating regional wastewater treatment, such as that done by GLSD. It is responsible for encouraging towns to cooperate in such efforts, and the director of the division has the authority to propose abatement districts and may force towns to join districts. G.L.c. 21, §§27, 28.
Some of the DEP’s general regulatory powers also pertain to wastewater treatment facilities. For example, the DEP has exclusive jurisdiction to grant permits to facilities for the discharge of pollutants into Massachusetts waters. G.L.c. 21, §§42, 43. Most importantly, under the GLSD’s enabling legislation, the DEP was given exclusive authority over both the GLSD operation in general and specifically over the improvements to the North Andover facility. 1968 Mass. Acts ch. 750, §7; 1997 Mass. Acts ch. 213, §12.
Clearly, there is a comprehensive statutory scheme in place to address matters of grave public concern (state and national), the continued problems of sewage disposal. The fact that these statutes do not specifically take authority away from the local Board of Health does not negate the legislatively intended larger statutory scheme. As in Peñera, the scheme clearly indicates an intent to have the DEP maintain authority over such treatment facilities. Not only does the enabling legislation specifically grant the DEP such authority, but its great attention to detail supports the contention that the legislative scheme included locating the facility at the North Andover site and giving the DEP plenary authority over the site assignment and other aspects of the plan. The great detail in the 1997 enabling legislation further demonstrates the Legislature’s desire to help speed the process, and the most expeditious way to do that was to have one piece of legislation that designated both the site of the physical plant and gave the GLSD the authority to contract with a single company. Moreover, chapters 83 and 21 grant the DEP and division of water pollution control comprehensive authority to regulate wastewater treatment and purification operations as part of a comprehensive statutory plan.
North Andover’s attempt to deny a site assignment for the Contract II facility clearly frustrates this legislative purpose. Because the local regulation interferes with the comprehensive statutory scheme put in place by the Legislature, an inference that the Legislature intended to bar such local regulation is clearly warranted.
2. The GLSD Is Immune from Municipal Regulation Because It Is a Legislatively Created Body Performing an Essential Government Function
In the alternative, GLSD asserts that as a legislatively created body performing an essential governmental function it is immune from local regulation. North Andover argues that it is not preventing the performance of a specific governmental function.
Massachusetts courts have a long history of holding that legislatively created entities are immune from local regulation when performing an essential governmental function.[17] See Town of Bourne v. Plante, 429 Mass. 329, 332 (1999) (recognizing that because the Woods Hole, Martha’s Vineyard and Nantucket Steamship Authority was a public instrumentality performing an essential government function, it did not need to comply with local zoning ordinances in order to operate a satellite parking facility); see also County Commissioners of Bristol v. Conservation Commission of Dartmouth, 380 Mass. 706, 708 (1998) (ruling that *575 land on which county commissioners were planning to build a jail was not subject to county’s zoning bylaws because a legislatively created entity performing an essential government function is immune from municipal zoning regulations).
The principle behind such immunity dates back to Teasdale v. Newell and Snowling Constr. Co., 192 Mass. 440, 443 (1906), where the Court first articulated the rule that “It is not to be presumed that the Legislature intended to give the local licensing board the authority to thwart the reasonably necessary efforts of’ the government entity “to perform their duty. . .” Id. at 443; see also Pereira, 364 Mass. at 121 (holding that a private gas company, approved by the Department of Public Utilities to construct and operate a gas storage facility was not required to also obtain a license from the municipality, as to hold otherwise would allow any municipality to deny access to vital services); Insp. Of Buildings of Salem v. Salem State College, 28 Mass.App.Ct. 92, 98 (1989) (finding that Massachusetts State College Building Authority was not required to comply with town zoning ordinances, because the requirement that it comply with Massachusetts Environmental Policy Act meant that a state agency would examine and consider the building’s impact on the local community, insuring that problems with the impact on the locality would be addressed). “The scope of the immunity is broad and . . . extends ... to cover ‘action reasonably related to that function.’ ” Bourne, 429 Mass. at 332.
In Town of Bourne, the SJC recognized that the lack of adequate parking for ferry patrons was a significant problem and that the Steamship Authority’s efforts to remedy the problem was an essential government function. Bourne, 429 Mass. at 330. Similarly, in County Commissioners of Bristol, the construction of a jail was also deemed an essential governmental function. County Commissioners of Bristol, 380 Mass. at 711. In both cases, the SJC looked to the legislative mandate articulated in the enabling legislation for guidance. In Bourne, the Steamship Authority was charged with providing adequate transportation of people and “necessaries” to the islands. Because such transportation is essential to those living and visiting the islands, the SJC held that the Steamship Authority was providing an essential government function. Bourne, 429 Mass. at 330. Given that providing adequate parking for people taking the ferry was integral to the ferry’s operation, it too was deemed to be an essential government function. Bourne, 429 Mass. at 330. The legislative mandate in County Commissioners of Bristol provided for suitable jails and houses of correction, a function vital to both the justice system and the public welfare, and so the building of a county jail was deemed an essential government function. County Commissioners of Bristol, 380 Mass. at 711; see also Medford v. Marinucci Bros. & Co. Inc., 344 Mass. 50, 57 (1962) (finding construction of a portion of the Massachusetts Turnpike to be an essential government function).
Similarly, the GLSD’s enabling legislation states that its purpose involves planning, building and operating facilities for the treatment and disposal of the wastewater generated by the designated towns. 1968 Mass. Acts ch. 750, §§1, 5, 7, 10. GLSD received the power to “supervise the maintenance and operation of the facilities of the district,” and also the power to “take such remedial action as may be necessary to maintain required standards.” Id. at §7. It is clear that GLSD was given a mandate by the Legislature to deal with the problems associated with sewage wastewater disposal. The Contract I and Contract II facilities are for the purpose of remediating longstanding problems with treatment and disposal of wastewater, and their functions are reasonably related to the underlying essential government function to quality these facilities as also being essential government functions. Bourne, 429 Mass. at 332. Given that sewage wastewater disposal is vital to the health and welfare of the population of the member towns, this Court concludes that, in building and ensuring operation of the Contract I and Contract II facilities, GLSD is performing an essential government function. As a legislatively created body politic and corporate, performing an essential governmental function, GLSD is immune from local regulation.
Because this Court has decided that the DEP has sole authority to issue a site assignment for the Contract I and II facilities, this Court will not address the issues related to the Memorandum of Understanding.[18]
B. Building Permits for the Contract I and II Facilities
The plaintiffs also seek a decision regarding building permits for the Contract I and II facilities. GLSD argues that as a body politic and corporate performing an essential government function it does not require a building permit, and alternatively, if it does require permits, the DEP or DPS are the only entities with the authority to grant or deny them. North Andover asserts that because GLSD buildings are not owned by the Commonwealth, any permits must be issued by the local Building Inspector.
The North Andover Building Inspector issued building permits for the Contract I and Contract II facilities on March 20, 2000, and June 19, 2000, respectively. The permit for the Contract II facility was conditioned on GLSD’s compliance with several conditions imposed by the North Andover Board of Health in its decision denying a site assignment to the Contract II facility. Because this Court has ruled that North Andover and/or its Board of Health have no authority to grant or deny a site assignment for the GLSD facilities, the conditions placed on the building permit for the Contract II project are deemed null and void. With the illegally issued conditions removed from the building permit, GLSD would be left with a valid building permit for the Contract II project, had the permit not expired on December 18, 2000. Given that the Court is hereby ordering the North Andover Building Inspec *576 tor to issue another building permit for the Contract II facility, without any other conditions, issues regarding the building permits are moot.

TV. ORDER

For the reasons stated, plaintiff GLSD and defendant NEFCO’s motion for summary judgment is ALLOWED as to Counts I, II, III, VI, and VII. Counts IV and V against the DEP and DPS, respectively, are hereby DISMISSED. The DEP, DPS, and DPH are hereby DISMISSED as defendants. It is further ORDERED:
1. That a declaration enter, declaring that the DEP, and not the Town of North Andover or any of its governing bodies, has sole authority to issue site assignments to GLSD;
2. That the North Andover Building Inspector, through the local Board of Health, has no authority to impose conditions on the building permit for the Contract II facility;
3. That the North Andover Building Inspector issue a new building permit for the Contract II facility without any conditions;
4. That a permanent injunction issue, restraining the defendant Town, its Board of Health, Board of Selectmen, servants, agents, or other governing bodies connected to North Andover, from interfering with or attempting to exert authority over GLSD;
5. That North Andover Board of Health’s order denying a site assignment is hereby deemed null and void.

 The court apologizes to the parties and counsel for the delay in the issuance of this decision, which is solely my responsibility. The delay is not attributable in any way to anything counsel or the parties may or may not have done.

 Count I is against all defendants and seeks a declaratory judgment as to what entity has authority to grant a site assignment; Count II is against all defendants and seeks a declaratory judgment as to what entity has authority to issue building permits; Count III is against North Andover, its board of health and board of selectmen seeking preliminary and permanent injunctions; Count IV, against the Department of Environmental Protection and Count V, against the Department of Public Safety, both seek a declaratory judgment stating that one or the other of the departments has the sole authority to issue building permits to GLSD; Counts IV and V also seek an order compelling the issuance of such permits; Count VI is against the North Andover board of health seeking an order quashing the board’s decision denying a site assignment; and, Count VII requests that the Court reverse the Board of Health’s decision and order it to issue a site assignment.

 The defendant DEP filed a brief and appeared at oral arguments in support of GLSD and NEFCO’s motion for summary judgment on the issue of which entity has authority to grant GLSD a site assignment. The motion also requests that the agencies be dismissed as defendants because there is no dispute between GLSD and DEP or DPS. The Court has dismissed the counts against the DEP, DPH and DPS for the reasons set forth in the Commonwealth’s memorandum.

 GLSD was authorized to treat wastewater for Salem, New Hampshire in 1982. 1982 Mass. Acts ch. 387.

 Three voting members are appointed by the Mayor of Lawrence, two by the Mayor of Methuen, one each appointed by the respective boards of selectmen of Andover and North Andover, and one non-voting member from Salem, New Hampshire. Each member serves a term of three years.

 Sludge is made up of partially cleansed solids that have been removed from the wastewater. This end product remains infectious and requires special handling. In the past, the Town has complained of the dangers of trucking this infectious waste through its streets.

 The Contract I construction contract was awarded to the Methuen Construction Company, Incorporated, and executed in January of 2000, at a contract price of $16,769,420.00. The construction of the Contract I facility seeks to reduce the volume of waste and kill most of the pathogens in the waste, resulting in an end product that is a Class B biosolid.

 The Contract II construction contract was awarded to the nominal defendant NEFCO, who has joined in the summary judgment motion with GLSD. That contract was executed in February of 1999, at a contract cost of $12,138,320.00. The Contract II facility would heat and dry the biosolids from Contract I, killing almost all remaining pathogens, and resulting in Class A biosolids, which can be treated the same as routine fertilizer. NEFCO would operate the Contract II facility and receive the profit from the sale of the fertilizer.

 FAA approval was required due to the smokestack needed for the Contract II facility.

 The initial MOU differentiated between pre-existing concerns North Andover had and any new concerns arising in connection with the proposed Contract I and II facilities. In addition, the agreement allowed North Andover to request advice from the DEP regarding any concerns North Andover had, and to solicit recommendations from the DEP.

 Construction on the Contract I facility is underway.

 G.L.c. 83, §6 reads, in part: “A Town, with the approval of the department of environmental protection . . . may purchase land within its limits ... for the treatment, purification and disposal of sewage.”

 G.L.c. 111, § 143 reads, in part: “No trade or employment which may result in a nuisance or be harmful to the inhabitants . . . shall be established in a city or town except in such a location as may be assigned by the Board of Health thereof

 The Biosolids facility also known as the Contract I and Contract II facilities.

 Given that GLSD was created by a legislative act that designated it a body politic and corporate, it is a legislatively created entity.

 Issues surrounding the MOU include, but are not limited to, whether construction on the Contract II facility should have been permitted to proceed during negotiations between the parties; the process by which North Andover was supposed to compile and report on its list of objections to the facility, as well as its suggestions for remediation; and, whether North Andover properly documented its findings related to the denial of a site assignment for the Contract II facility.